IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br><br>JEFFREY ALAN BENJAMIN | CRIMINAL NO. 3:21cr525<br>15 U.S.C. § 78m(b)(2)(A)<br>18 U.S.C. § 1343<br>18 U.S.C. § 1348<br>18 U.S.C. § 1349<br>18 U.S.C. § 2<br>18 U.S.C. § 981(a)(1)(C)<br>28 U.S.C. § 2461(c)<br><br>INDICTMENT |

THE GRAND JURY CHARGES:

At all times relevant to this Indictment:

1.     The defendant, JEFFREY ALAN BENJAMIN, is a former Westinghouse Electric Company ("Westinghouse") executive and Senior Vice President of New Plants and Major Projects. Westinghouse contracted with two South Carolina utility companies, SCANA and Santee Cooper (collectively, the "Owners"), to construct two new nuclear power plants in Jenkinsville, South Carolina. As construction problems mounted, costs rose, and schedules slipped, the defendant and others hid the true status of the project. Through intentional and material misrepresentations and omissions, the defendant, JEFFREY ALAN BENJAMIN, and others, deceived the Owners, regulators, investors, and ratepayers in order to maintain cash flow and liquidity for Westinghouse. The defendant's misrepresentations and omissions, as well as the associated cover-up, resulted in billions of dollars of loss to the Owners, ratepayers, and investors.

Parties

2.     Westinghouse was a Cranberry, Pennsylvania-based company that designed the AP1000, a next-generation, modular-based nuclear power plant. Westinghouse was a subsidiary of Toshiba Corporation ("Toshiba").

3.     JEFFREY ALAN BENJAMIN was employed by Westinghouse and served as its Senior Vice President for New Plants and Major Projects. JEFFREY ALAN BENJAMIN had first-line responsibility for the construction of Westinghouse's nuclear reactors worldwide.

1

4.      SCANA was a publicly-traded holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA was incorporated in South Carolina and maintained its principal executive offices in Cayce, South Carolina. SCANA's stock was listed on the New York Stock Exchange ("NYSE") under the ticker symbol "SCG."

5.      SCANA's principal subsidiary, South Carolina Electric and Gas Company ("SCE&G"), was a regulated public utility engaged in the generation, transmission, distribution, and sale of electricity, primarily in South Carolina. SCE&G was a regulated monopoly with reporting requirements. (Hereinafter, SCANA and SCE&G will be referred to singularly as "SCANA"). As a regulated monopoly that was publicly-traded, SCANA was required to provide truthful information to regulatory authorities and investors.

6.      The South Carolina Public Service Authority ("Santee Cooper") was a state-owned utility that provided power and water to citizens of Lowcountry South Carolina and to approximately twenty electric cooperative companies.

7.      Fluor Enterprises ("Fluor") was a global construction and engineering firm based in Texas.

8.      South Carolina's Public Service Commission ("PSC") was a board comprised of seven elected persons entrusted by the State of South Carolina with regulating utility rates. The PSC performs the adjudicative function of utility regulation.

9.      The South Carolina Office of Regulatory Staff ("ORS") was a state authority responsible for inspecting, auditing, and examining public utilities. The ORS had a dual mandate: (1) it represented South Carolina's public interest in utility regulation before the PSC, the court system, the South Carolina General Assembly, and federal regulatory bodies; and (2) it advanced the utilities' interests. In fulfilling these dual roles, the ORS performed the investigative, legal, prosecutorial, and educational roles of utility regulation, while at the same time acting as an advocate for the utilities.

10.     The United States Securities and Exchange Commission ("SEC") was an independent agency of the federal government. The SEC holds primary responsibility for: (1) enforcing federal securities laws; (2) issuing securities rules; and (3) regulating the securities industry, the nation's stock and options exchanges, and other activities and organizations, including the electronic securities markets in the United States.

Background

11.     In May 2008, the Owners signed an Engineering, Procurement, and Construction contract ("EPC Agreement") with Westinghouse to construct two AP1000 nuclear reactors (the "Project") at the V.C. Summer site in Jenkinsville, South Carolina. Since an operational reactor already existed at the site, these two units would be Units 2 & 3. The schedule for Unit 2 indicated that it would be finished before Unit 3.

12. SCANA held the majority ownership interest of 55%, while Santee Cooper held the remaining 45% ownership interest. The EPC Agreement utilized a "consortium" approach, which meant that a third party was the actual builder of the reactors. Various companies occupied the role of dedicated builder. By the middle of 2015, however, CB&I Stone & Webster ("CB&I") was acting in this capacity (a role it had occupied since in or about 2013). As the Project's chief constructor, CB&I owned and controlled the schedule.

13. SCANA did not have the capital to directly finance the cost of the Project, initially estimated at $9.8 billion. Instead, SCANA depended on financial incentives provided under the Energy Policy Act of 2005 ("Energy Policy Act"), 42 U.S.C. § 15801, et seq., and the Base Load Review Act ("BLRA"), S.C. Code Ann. §§ 58-33-210, et seq., to finance the Project.

14. The Energy Policy Act provided SCANA with tax incentives to make the Project financially viable. If SCANA completed the Project by December 31, 2020, SCANA would qualify for tax credits worth approximately $1.4 billion.

15. The BLRA provided SCANA with additional financial incentives to build the Project. Passed by the South Carolina General Assembly in 2007, the BLRA permitted utility companies to petition the PSC to raise utility rates to cover the construction financing costs during the Project rather than wait for completion to raise rates. However, to cover the construction financing costs under the BLRA, SCANA was required to demonstrate that its actions were "prudent." S.C. Code Ann. § 58-33-225. SCANA was required to obtain PSC approval of its construction schedule and capital costs in order to collect any proposed rate increases from utility customers.

16. From the outset, the Project was characterized by substantial delays and cost overruns. In June 2015, Westinghouse and CB&I began negotiations for Westinghouse to acquire CB&I's nuclear subsidiary, Stone & Webster. Westinghouse would assume the role of general contractor and hire Flour to finish the Project.

17. Beginning in or about July 2015, Westinghouse commenced its due diligence efforts by retaining Berkeley Research Group ("BRG") to conduct an independent assessment and evaluation of the construction schedule for the Project, as well as the two units being constructed by Westinghouse at the Vogtle nuclear expansion in Waynesboro, Georgia. BRG focused its analysis on the "remaining duration required to complete each unit."

18. Westinghouse's due diligence period and the accompanying transition plan to take over as the Project's chief constructor was referred to as "Project Bluefin." The primary purpose of Project Bluefin was to determine how Westinghouse, and its new subcontractor, Fluor, would work together to secure a successful outcome on all nuclear plants being constructed by Westinghouse in the United States.

19. At the time of Project Bluefin, the construction schedule for the Project contemplated completion dates of June 2019 and June 2020 for Units 2 and 3, respectively (the "June-June schedule"). BRG, as an integral part of Project Bluefin, identified the most significant risks to the Project schedule and concluded, among other things, that the aggregate impact from

3

these risks resulted in completion dates for Units 2 and 3 that were delayed by up to thirteen months.

20. The Owners used this shift in responsibilities to amend the EPC Agreement, including a "Fixed Price Option," which, upon exercise, would shift the risk of future cost escalations to Westinghouse. The parties also negotiated a two-month extension for the completion dates of the reactors to August 2019 and August 2020 (the "August-August Schedule"). The EPC included provisions that would assess penalties against Westinghouse for missing the completion dates or the PTC deadline. The amendment was agreed to on October 27, 2015 (the "EPC Amendment"). Westinghouse took full control of the Project on January 1, 2016.

21. In January 2016, Westinghouse took command of the Project schedule and Fluor, as Westinghouse's subcontractor, took over as chief builder. At this point, the Project was only achieving an average monthly completion rate of about 0.5%, which, if continued, would result in completion dates substantially beyond the December 31, 2020, tax credit deadline. Westinghouse's goal was a 3% monthly completion rate.

22. Westinghouse's transition plan called for the formulation of a new Estimate-to-Complete ("ETC"). An ETC involves calculating the remaining time and cost to complete the outstanding balance of a construction project. The scheduling component of the ETC is often referred to as a schedule "rebaseline."

23. During and after the transition, JEFFREY ALAN BENJAMIN communicated directly with the Owners' senior management concerning the overall status of the Project, including the ability of the Project to be completed by dates inside of the December 31, 2020 federal production tax credits deadline. JEFFREY ALAN BENJAMIN later acknowledged that he knew the significance to the Owners of meeting the federal production tax credits deadline.

24. Throughout 2016, Westinghouse sent monthly letters updating the Owners on the status of the Project schedule. In addition, Westinghouse and the Owners attended monthly Project review meetings on site. The schedule updates presented by Westinghouse to the Owners during 2016 and early 2017 were substantially and materially false.

25. For approximately the first half of 2016, Fluor focused on gathering necessary data from Westinghouse in order to rebaseline the schedule and complete the ETC. Westinghouse did not initially provide the necessary support for this effort and substantially limited Fluor's access to relevant data and information. The Owners expected a new, fully-integrated and resource-loaded schedule no later than September 2016.

26. On or about May 26, 2016, SCANA elected to exercise the Fixed Price Option. Under this option, which was negotiated as part of the EPC Amendment, the Owners could fix the price of the remaining work necessary to complete the V.C. Summer nuclear expansion at around $6 billion. This election shifted the risk of future cost escalations to Westinghouse. This shifting of financial risk did not alleviate concerns regarding the schedule for completion and the necessity of earning the federal production tax credits.

4

27. On a quarterly basis in 2016, the parties convened a "Presidents' Meeting." The Presidents' Meeting was attended by the CEOs of SCANA, Santee Cooper, Westinghouse, and Fluor, as well as other members of senior management and various individuals involved in the construction of the project.

28. The Presidents' Meeting convened on June 30, 2016, included a PowerPoint presentation containing a "Five Focus Areas" theme, authored by SCANA. The five focus areas related to Procurement, Modules, Design Issues, Construction Resources, and Construction Efficiency. Specifically, the Five Focus Areas detailed the reasons why the current schedule was unreliable. During this meeting, a senior Fluor representative opined that the June-June Schedule was not achievable.

29. Despite the content of the June 30th Presidents' Meeting, SCANA submitted pre-filed testimony with the PSC on July 1, 2016. This testimony attested that Westinghouse and Fluor had a construction plan in place to achieve the August-August completion dates and that the schedule was reasonable and prudent under the circumstances.

30. SCANA organized an August 5, 2016, meeting with the ORS and three additional parties known as interveners. During the meeting, the ORS asked if the schedule was achievable. A Westinghouse representative, in the presence of JEFFREY ALAN BENJAMIN, answered this question in the affirmative.

31. On the same day of the ORS/intervener meeting, SCANA filed a quarterly report on Form 10-Q with the SEC. Among other things, the filing stated – falsely – that both "New Units are expected to be operational and to qualify" by the deadline in order for the company to obtain approximately $1.4 billion in federal production tax credits. In truth, SCANA and Westinghouse executives, including JEFFREY ALAN BENJAMIN, knew that both units were not on track to meet the December 31, 2020 deadline without unprecedented improvements in pace and productivity.

### The Rebaselining Effort

32. On or about August 24, 2016, the Fluor team informed Westinghouse of its progress. Fluor prepared a "V.C. Summer Project Construction Baseline Presentation." Fluor's preliminary analysis predicted that Unit 2 would not be finished until August 2022, a three-year delay from the August 2019 completion date that SCANA had just submitted to the PSC for regulatory approval. Certain Westinghouse employees acknowledged that Fluor's August 2022 calculation was likely accurate. According to a Westinghouse scheduler, it was very possible that public dissemination of Fluor's preliminary completion date for Unit 2 would kill the Project.

33. JEFFREY ALAN BENJAMIN was made aware of Fluor's findings, and he expressed that the date was unacceptable. Regardless, JEFFREY ALAN BENJAMIN repeatedly informed Fluor representatives that the Project schedule had to be the June-June Schedule.

34. On August 31, 2016, Fluor sent a letter to Westinghouse. The letter provided, in pertinent part, as follows:

> While many of Fluor's planners and managers believe, based on their years of professional experience, that the current schedules are unrealistic, they also believe it would be unethical to produce schedules and drive to schedules they believe are not realistic or impracticable under the circumstances. Relying on such unrealistic schedules will lead to needless expenditure of funds and an overall increase in the cost of the project.
>
> Fluor wants to do all it can to support WEC's goals and objectives, but Fluor also believes that it has a responsibility to advise WEC when these goals and objectives seem highly improbable, which is the purpose of this letter.
>
> Again, Fluor requests that it be permitted to perform a more objective analysis to provide an analytical response that we believe is likely to support this opinion. However, Fluor is hindered in its ability to perform such an analysis so long as WEC continues to withhold providing an electronic copy of the schedule.

Fluor further stated that it would continue to follow Westinghouse's directive on constraining the project schedule but insisted that it fundamentally disagreed with Westinghouse's approach in this regard. JEFFREY ALAN BENJAMIN received this letter.

    35.    On September 12, 2016, Westinghouse issued a letter to Fluor that stated, in part,

> Contractor regularly reviews and analyzes construction schedules for potential risks and makes adjustments as appropriate. Contrary to Subcontractor's assertion, the schedules reflect a reasonable number of activities given the scope and complexity of the projects. Subcontractor's unsupported allegations that Contractor is being unethical or relying upon unrealistic, improbable, or unachievable schedules is without merit. Contractor has consistently managed the schedules with prudence and in accordance with the standard of care set forth in the respective EPC Agreements.
>
> …Contractor maintains control and governance over the project schedules. And, although Subcontractor's input is encouraged and has been valuable, Contractor is responsible for performing any risk reviews or evaluations on the overall schedules. As a result, we will not be transferring any copies of the schedules to Subcontractor as requested in your letter…

    36.    On August 31, 2016, Fluor had sent a second letter to Westinghouse. The letter provided, in pertinent part, "Fluor have continued to evaluate the ETC development schedule….

> The attached Schedule shows two completion dates,
> - October 21st for the ETC based on a "June/June" project completion.
> - November 11th for the ETC based on Fluor recommended schedule.

37.     Later on August 31, 2016, after receiving the letter referenced in Paragraph 36, JEFFREY ALAN BENJAMIN wrote "Also when do we release D_____ [author of the Fluor letter]? Rest of his team? Stop EAC effort? Who has action.??"

38.     On September 19, 2016, Westinghouse issued a letter to Fluor that contained the following directive: "Stop all work on developing an ETC estimate and its associated schedule for what Fluor terms its "Fluor Proposed Baseline Schedule" as this is not in support of the 'June/June' schedule and is not what has been requested." This letter claimed that Fluor's ETC rebaseline was "outside the scope of the ETC effort." Westinghouse further admonished Fluor by stating there is "but one schedule on the project and that schedule is the schedule [Westinghouse has] termed, the June/June schedule." This letter required Fluor to cease and desist all attempts to rebaseline the project schedule.

39.     JEFFREY ALAN BENJAMIN authorized Westinghouse employees to issue the letter referenced in Paragraph 38.

40.     On or about September 21 and 22, 2016, representatives of Fluor and WEC, including JEFFREY ALAN BENJAMIN, met in Aiken, South Carolina. Fluor and WEC agreed that Fluor would stop working on the schedule rebaseline and would complete the ETC based on the June-June schedule. Fluor and WEC would work together on a rebaseline of the schedule. A Fluor attendee told JEFFREY ALAN BENJAMIN that Fluor would not support the June-June end dates. JEFFREY ALAN BENJAMIN responded that Fluor was WEC's subcontractor and would do what WEC wants.

41.     On September 26, 2016, the Presidents' Meeting for the third quarter occurred. According to contemporaneous notes, during the meeting, SCANA's CEO asked: "Do you know of anything today that tells you [the] dates [are] not achievable?" According to the same notes, JEFFREY ALAN BENJAMIN answered by saying "no, nothing today." JEFFREY ALAN BENJAMIN stated that the current Westinghouse schedule projected completion dates for Unit 2 at November 2019 and Unit 3 at July 2020.

42.     JEFFREY ALAN BENJAMIN further told the Owners he expected a schedule from Fluor at the end of October 2016. JEFFREY ALAN BENJAMIN did not mention Fluor's preliminary prediction of a three-year delay and a Unit 2 completion date of August 2022.

43.     On November 4, 2016, SCANA filed a quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2016. The filing contained the following disclosure:

> WEC has engaged Fluor to review and confirm the project schedule. The owners understand that this process has not been completed. The analysis by Fluor, to the extent that it is shared with the owners, could affect the owners' expectation regarding the project schedule. In a discussion of the project status on September 26, 2016, and in response to [SCANA's] specific questioning regarding work crew efficiency and productivity and schedule mitigation efforts, WEC executive management stated that it had no reason to believe that the August 2019 and August 2020 guaranteed completion dates would not be met. WEC submits monthly

schedule updates, however, and it has reported that there are significant risks to achieving the current guaranteed substantial completion dates. WEC has also reported that it is continuing to develop detailed mitigation plans to address those risks.

44.     On or about October 5, 2016, a meeting of senior executives from Toshiba and Westinghouse was convened at Westinghouse's headquarters. JEFFREY ALAN BENJAMIN attended. During this meeting, Westinghouse's site director conveyed to senior leadership that the Project schedule was not achievable and not realistic.

45.     Fluor submitted its ETC to Westinghouse in or about October 2016. Fluor estimated that it would cost Westinghouse approximately $9.8 billion to complete all of its nuclear construction in the United States. Westinghouse assembled its own team to evaluate Fluor's ETC numbers. On or about November 30, 2016, this Westinghouse team concluded that the nuclear construction in South Carolina and Georgia would result in at least $6 billion in losses for Westinghouse.

46.     Westinghouse's senior executive team, in particular its Interim CEO, believed there were significant gaps and uncertainties surrounding the ETC number generated on November 30, 2016.

47.     During the first week of December 2016, the Westinghouse Interim CEO chartered an "Independent Review Team" (IRT), accountable directly to him, charged with independently assessing and finalizing the estimate to complete the US AP1000 projects. At the outset of the IRT process, the co-Team Leader of the IRT, who also served as Westinghouse's finance director with oversight over nuclear plants and major projects, had calculated a maximum allowable loss of $2 billion. JEFFREY ALAN BENJAMIN exerted significant influence over IRT members and attempted to steer the IRT towards issuing and approving a final ETC number in the $2 billion range.

48.     On December 22, 2016, the IRT rendered a projected ETC loss of approximately $6.3 billion, which was subsequently reduced on the same day to approximately $5.8 billion.

49.     On December 26, 2016, the IRT's conclusion was presented to Westinghouse's Chairman of the Board, as well as certain key representatives from Toshiba. JEFFREY ALAN BENJAMIN attended this presentation and took the position that IRT conclusion was overstated by at least $3 billion. Within 48 hours, the $5.8 billion estimate was reduced to around $3 billion.

50.     On December 27, 2016, Toshiba issued a preemptive press release that stated, in pertinent part, as follows:

> Westinghouse is evaluating the cost to complete the AP1000 contracts in order to measure the fair value of acquired assets and liabilities. Westinghouse has found that the cost to complete the US projects will far surpass original estimates…[C]urrent estimation shows a level of several billion US dollars.

51. On the same day as Toshiba's press release, JEFFREY ALAN BENJAMIN and at least one other executive participated in a call with the Owners. JEFFREY ALAN BENJAMIN represented to the Owners that Westinghouse had made significant progress on its fully integrated resource loaded schedule and planned to make it available by the end of January 2017. JEFFREY ALAN BENJAMIN also told the Owners that Westinghouse had decided internally to bring Bechtel Power Corporation onto its construction team based on the assertion that it was "beyond [the] bandwidth of Fluor to ensure" a successful project outcome.

52. By the end of January 2017, Toshiba's auditor concluded the $3 billion loss estimate was unsupported. Westinghouse assembled another team to analyze and revisit the cost estimate. That team reverted to the December 2016 ETC variance of $5.8 billion. After consultation with all participants, the final ETC number was settled upon at $6.1 billion.

53. On February 14, 2017, JEFFREY ALAN BENJAMIN and other Westinghouse executives participated in a call with the Owners. Westinghouse disclosed to the Owners that Toshiba was facing a $6.3 billion loss, of which $6.1 billion was specifically attributed to Westinghouse's nuclear construction projects in the United States. Beyond this, Westinghouse would not be able to provide a fully integrated resource loaded schedule for at least another month. New "commercial operation dates" had been established for the units: April 2020 for Unit 2 and December 2020 for Unit 3.

54. According to at least one senior Westinghouse official, the April 2020 and December 2020 completion dates were not true. JEFFREY ALAN BENJAMIN was included in an email chain that approved delivering those dates to the Owners. Soon after the February 14, 2017 Westinghouse call, SCANA filed a non-periodic report on Form 8-K with the SEC. The filing contained the following disclosure:

> [The Owners] have received information from Westinghouse Electric Company (WEC) officials that indicates WEC and its parent guarantor, Toshiba Corporation (Toshiba), are committed to completing the two new Westinghouse AP1000 nuclear units being constructed in Jenkinsville, SC. In addition to this reaffirmation, Westinghouse provided SCE&G with revised in-service dates of April 2020 and December 2020 for Units 2 and 3, respectively. WEC intends to make the complete integrated project schedule supporting these dates available for SCE&G to review. The completion dates provided in the new schedule are within the 18 month contingency period provided under the construction provisions of the Base Load Review Act administered by the [PSC] and would enable both units to qualify, under current law, for the federal production tax credits.

55. On or around March 29, 2017, Westinghouse filed a voluntary Chapter 11 petition for reorganization in the United States Bankruptcy Court for the Southern District of New York.

56. At or around the time of the bankruptcy, Westinghouse was spending over $120 million per month on its reactors in South Carolina. In the months that ensued, however, Westinghouse would elect to reject the EPC Agreement, including the Fixed Price Option, leaving the Owners without a viable constructor for the Project. Westinghouse never provided the Owners

9

with a rebaselined schedule and ETC. Similarly, Westinghouse never finished its "fully integrated resource loaded schedule," which had been previously promised to the Owners on a number of occasions.

57. JEFFREY ALAN BENJAMIN was relieved of his duties on or about March 14, 2017.

58. In the immediate aftermath of Westinghouse's petition for bankruptcy, the Owners assembled their own team to review Westinghouse's cost and schedule data. In or around July 2017, the Owner-directed ETC delivered its conclusion. As a result, the Owners abandoned the Project on or about July 31, 2017.

59. This decision was conveyed by the SCANA CEO to his employees on August 2, 2017:

> Our estimate of the additional costs to complete the Units was approximately three times what Westinghouse had provided us at the time of the bankruptcy. Even after factoring in the parental guarantee, the resulting increase would have been approximately $1.1 billion. **Our evaluation team also arrived at substantial completion dates of Dec. 31, 2022 for Unit 2 and March 31, 2024 for Unit 3** – several years beyond Westinghouse's previous estimate.

10

## The Scheme

60.     From at least in or around 2015, the defendant, JEFFREY ALAN BENJAMIN, and others, through Westinghouse, engaged in a scheme, plan, and artifice to defraud the Owners and ratepayers to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading; and to knowingly and intentionally execute a scheme and artifice to defraud any person in connection with any security of SCANA, an issuer with a class of securities registered under Section 12(b) of the Securities Exchange Act of 1934.

61.     The defendant, JEFFREY ALAN BENJAMIN, and others, through Westinghouse, made materially false and misleading statements in an effort to continue the Project by minimizing the Project's failures. Among other things, false and misleading statements were made to the Owners, the PSC, the ORS, the South Carolina state government, and SCANA investors. In addition, the defendant, JEFFREY ALAN BENJAMIN, and others, withheld derogatory information regarding the status of the project for the purposes of obtaining money from the Owners. Among the falsehoods, the defendant, JEFFREY ALAN BENJAMIN, and others:

a.  Represented to the Owners that Unit 2 would be completed and operational at various dates and would qualify for the PTCs, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy knew that the dates they were conveying to the Owners were unrealistic and would not likely be met.

b.  Represented to the Owners that Unit 3 would be completed and operational to qualify for the PTCs, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy knew that the dates they were conveying to the owners were unrealistic and would not likely be met.

c.  Represented to regulatory agencies through direct contact and through dates that were provided to SCANA that reasonably and foreseeably would be transmitted to the regulatory agencies through filings that Unit 2 would be operational in 2019, and would qualify for the PTCs, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy knew that the dates they were conveying to the Owners were unrealistic and would not likely be met.

d.  Represented to regulatory agencies through direct contact and through dates that were provided to SCANA that reasonably and foreseeably would be transmitted to the regulatory agencies through filings that Unit 3 would be operational in 2020, and would qualify for the PTCs, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy knew that the dates they were conveying to the Owners were unrealistic and would not likely be met.

e.  Represented to the market through dates that were provided to SCANA that reasonably and foreseeably would be transmitted to the market through filings that

        Unit 2 would be operational in 2019, and would qualify for the PTCs, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy knew that the dates they were conveying to the owners were unrealistic and would not likely be met.

f.    Represented to the market through dates that were provided to SCANA that reasonably and foreseeably would be transmitted to the market through filings that Unit 3 would be operational in 2020, and would qualify for the PTCs, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy knew that the dates they were conveying to the owners were unrealistic and would not likely be met.

g.    Represented to the Owners that Units 2 and 3 would be operational in 2019 and 2020, when in truth the defendant, JEFFREY ALAN BENJAMIN, and other members of the conspiracy, knew the Project to be significantly off-schedule and over-budget.

h.    Represented to regulatory agencies and investors costs of the Project that were significantly and materially lower than what was known.

i.    Represented to the Owners on September 26, 2016, that Westinghouse had no information that the substantial completion dates of June 2019 (Unit 2) and June 2020 (Unit 3) would not be met, when in truth Westinghouse had been provided information from Fluor that Unit 2 would not be completed until August 2022.

j.    Represented to the Owners on September 26, 2016, that a fully resource-loaded integrated schedule was being prepared, when in truth Westinghouse had ordered Fluor to stop work on determining a project schedule.

### The Object of the Conspiracy

62. The object of the conspiracy was for the defendant, JEFFREY ALAN BENJAMIN, and others, through Westinghouse, to provide false representations and omit necessary facts in disclosures to the PSC, the ORS, the South Carolina state government, the Owners, SCANA investors, and to ratepayers, so that the construction of the Project would continue, minimizing regulatory risk and avoiding legislative oversight, all for the purpose of obtaining money from the Owners.

### COUNT 1
### Conspiracy

From a time unknown to the Grand Jury, but beginning at least in or around 2015 and continuing until the date of this Indictment, in the District of South Carolina and elsewhere, the defendant, JEFFREY ALAN BENJAMIN, and others, through Westinghouse, knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding to:

a. knowingly devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and in furtherance of this scheme, did use and cause to be used the United States mail and common carriers, in violation of Title 18, United States Code, Section 1341;

b. knowingly devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343;

c. execute and attempt to execute a scheme and artifice to defraud other persons in connection with stock securities of SCANA, an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 ("the Exchange Act") and that was required to file reports under section 15(d) of Exchange Act, in violation of Title 18, United States Code, Section 1348(1).

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 through 14
## Wire Fraud

THE GRAND JURY FURTHER CHARGES:

1.     Paragraphs 1 through 58 the Indictment are incorporated herein by reference as setting forth a scheme and artifice to defraud SCANA and Santee Cooper.

2.     On or about the dates listed below, in the District of South Carolina and elsewhere, the defendant, JEFFREY ALAN BENJAMIN, and others, through Westinghouse, as principals, aiders and abettors, and co-participants in jointly undertaken criminal activity, for the purpose of executing the above-described scheme and artifice to defraud SCANA and Santee Cooper, did transmit and cause to be transmitted in interstate commerce, by means of a wire, certain signs, signals, and sounds, that is, monthly bills as described below;

| Count | Date | Wire Transmission |
| --- | --- | --- |
| 2 | September 6, 2016 | $20,833,333.34 |
| 3 | September 15, 2016 | $100,000,000 |
| 4 | October 5, 2016 | $20,833,333.34 |
| 5 | October 17, 2016 | $133,000,000 |
| 6 | November 7, 2016 | $20,833,333.34 |
| 7 | November 15, 2016 | $136,500,000 |
| 8 | December 7, 2016 | $20,833,333.26 |
| 9 | December 12, 2016 | $75,000,000 |
| 10 | January 4, 2017 | $36,849,440.88 |
| 11 | January 31, 2017 | $36,849,440.88 |
| 12 | February 16, 2017 | $4,802,668.71 |
| 13 | February 27, 2017 | $36,849,440.88 |
| 14 | March 15, 2017 | $36,849,440.88 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 15
## Securities Fraud

THE GRAND JURY FURTHER CHARGES:

1. Paragraphs 1 through 58 of the Indictment are incorporated herein by reference as setting forth a scheme and artifice to defraud investors as related to SCANA, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under section 15(d) of Exchange Act.

2. From a time unknown to the Grand Jury, but beginning at least in or around 2015 and continuing into 2017, in the District of South Carolina and elsewhere, the defendant, JEFFREY ALAN BENJAMIN, and others, as principals, aiders and abettors, and co-participants in jointly undertaken criminal activity, did provide false statements for the purpose of executing the above-described scheme and artifice to defraud other persons in connection with stock securities of SCANA, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 ("the Exchange Act") and that was required to file reports under section 15(d) of Exchange Act.

All in violation of Title 18, United States Code, Sections 1348(1) and 2.

## COUNT 16
## (Causing the Failure to Keep Accurate Corporate Records)

THE GRAND JURY FURTHER CHARGES:

1. Paragraphs 1 through 58 of the Indictment are incorporated herein by reference as setting forth a scheme and artifice to defraud investors as related to SCANA, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under section 15(d) of Exchange Act. Under federal law, SCANA and its officers had a duty to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the company.

2. From in or about 2015 through 2017, in the District of South Carolina and elsewhere, the defendant, JEFFREY ALAN BENJAMIN, willfully and knowingly, and directly and indirectly, caused the failure of SCANA to keep books, records, and accounts which accurately and fairly reflected the transactions and dispositions of the assets of SCANA as they related to the Project, and he did aid and abet the same.

All in violation of Title 15, United States Code, Section 78m(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE

SPECIFIED UNLAWFUL ACTIVITIES/FAILURE TO KEEP ACCURATE RECORDS:

Upon conviction of violating Title 15, United States Code, Section 78m and Title 18, United States Code, Sections 1341, 1343, 1348, and 1349, as charged in the Indictment, the defendant, JEFFREY ALAN BENJAMIN, shall forfeit to the United States any property, real or personal, constituting, derived from, or traceable to proceeds the Defendant obtained, directly or indirectly, as a result of such offenses.

PROPERTY:

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the property subject to forfeiture includes, but is not limited to, the following:

### Proceeds/Forfeiture Judgment:

A sum of money equal to all proceeds the Defendant obtained, directly or indirectly, from the offenses charged in the Indictment, that is, approximately $680,033,765.51 in United States currency, and all interest and proceeds traceable thereto, and/or such sum that equals all property derived from or traceable to his violation of 15 U.S.C. § 78m and 18 U.S.C. §§ 1341, 1343, 1348, and 1349.

SUBSTITUTE ASSETS:

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendant --

      A.   Cannot be located upon the exercise of due diligence;
      B.   Has been transferred or sold to, or deposited with, a third person;
      C.   Has been placed beyond the jurisdiction of the court;
      D.   Has been substantially diminished in value; or
      E.   Has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property;

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A <u>True Bill</u> BILL

_____
FOREPERSON

_____
M. RHETT DEHART (WDHjr, BBA, EEL)
ACTING UNITED STATES ATTORNEY