**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No. 3:21-CR-00525-MGL** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JEFFREY ALAN BENJAMIN** | ) | |
| | ) | |

## GOVERNMENT'S RENEWED MOTION TO DISQUALIFY COUNSEL

The United States of America, by and through its undersigned Assistant United States Attorneys, hereby moves this Court to disqualify William M. Sullivan, Jr. ("Mr. Sullivan") and his law firm, Pillsbury Winthrop Shaw Pittman LLP ("PWSP"), from participating in the defense of the Defendant, Jeffrey A. Benjamin ("Benjamin"). Mr. Sullivan's decision over two years ago to represent both Benjamin and a colleague – two materially adverse clients in the same matter – despite repeated Government warnings, has predictably metastasized and now presents a conflict of interest under South Carolina Rule of Professional Conduct ("SCRPC") 1.9, as well as an unwaivable Sixth Amendment deficiency in the proceedings. In an attempt to avoid disqualification, Mr. Sullivan has now produced "waivers" from his current and former clients that do not resolve (and, in fact, deepen) his long-apparent conflicts of interest, all while raising new constitutional concerns and presenting intractable problems for trial in this case.

The United States is now compelled to raise these issues for the Court, as Mr. Sullivan cannot properly represent Benjamin and also cross-examine his former client at trial. Accordingly, and notwithstanding Mr. Sullivan's purported "waivers," the Court should disqualify him and PWSP, and grant Benjamin reasonable time to obtain new, unconflicted, counsel.

This is the Government's second motion to disqualify Mr. Sullivan. *See In re: Matter Occurring Before Grand Jury 3*, 3:20-mc-00504-MGL. As the Court is aware, on December 10,

2020, the Government first moved to disqualify Mr. Sullivan due to his simultaneous representation of two materially adverse clients – the same individuals that are now the focus of this renewed motion: Benjamin (formerly a target, now the named Defendant) and Danny Roderick ("Roderick") (formerly a subject and now a Government witness). The Government submitted its initial motion to disqualify during the pendency of its grand jury investigation, and focused on Mr. Sullivan's violation of SCRPC 1.7, which governs current-client conflicts of interest. *Id.* at Dkt. No. 7. Confronted with the Government's motion, Mr. Sullivan released Roderick as a client. In response, the Government withdrew its motion but observed that "Mr. Sullivan's ongoing representation of Jeffrey Benjamin in this matter could present additional conflicts under SCRPC Rule 1.9" and specifically reserved "the right to re-assert a conflict under SCRPC Rule 1.9 or any other related issues, as may be necessary to protect the integrity of this investigation and the grand jury process." *Id.* at Dkt. No. 10.

Because Mr. Sullivan's conflicts of interest remain unresolved, the Government must now renew its motion to disqualify.[1] In the year since the Government's initial motion, the adverse relationship between Mr. Sullivan's current client (Benjamin) and former client (Roderick) has only grown. Roderick has met with Government investigators and provided incriminating information against Benjamin. And based in part upon Roderick's statement, Benjamin was indicted by the grand jury on multiple counts of conspiracy, wire fraud, and securities fraud. The Government now intends to call Roderick as a prosecution witness at Benjamin's trial.

---

[1] The Government has an affirmative obligation to notify the Court of conflicts as they arise rather than wait until post-conviction proceedings. *See United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995) (considering defendant's claims of ineffective assistance of counsel due to a conflict, raised for the first time on appeal, and expressing the court's trust that "it will not take another decision to induce the government to bring any conflict of interest to the district court's attention, rather than remaining silent in order to gain a tactical advantage from that conflict.").

2

Mr. Sullivan's continued representation of Benjamin therefore presents an actual conflict – foreseen by the Government and raised with Mr. Sullivan on numerous occasions over the past two years. As this case proceeds to trial, Mr. Sullivan's continued representation of Benjamin would violate both the Sixth Amendment and the South Carolina Rules of Professional Conduct, as Mr. Sullivan cannot uphold his duty of loyalty and confidentiality to former client Roderick while simultaneously meeting his constitutional and ethical obligations to vigorously defend Benjamin. Put simply, Mr. Sullivan cannot properly expect to cross-examine his own former client in defense of his current one. These conflicts jeopardize the integrity and fairness of these proceedings, and these deficiencies cannot be cured by informed consent. Even when a conflict has been purportedly waived, a district court must "exercise its own independent judgment as to whether the proceedings are likely to have the requisite integrity if a particular lawyer is allowed to represent a party." *United States v. Williams*, 81 F.3d 1321, 1324 (4th Cir. 1996). Thus, under binding Fourth Circuit precedent, and notwithstanding Mr. Sullivan's newly-acquired "waivers," the appropriate remedy is disqualification.

## I.    BACKGROUND[2]

During the relevant time period, Benjamin was the Senior Vice President for New Plants and Major Projects at Westinghouse Electric Company ("WEC"). Dkt. No. 2 at ¶ 3. For much of the relevant time period, Benjamin reported regularly to Roderick, who was the Chief Executive Officer ("CEO") at WEC. In February 2016, Roderick became CEO of Toshiba's Energy Systems Solutions ("ESS"), where he was responsible for managing 162 subsidiary companies.[3] As part of

---

[2] The factual narrative is derived from interviews, documents obtained from Federal Grand Jury Subpoenas, public source documents, attorney proffers, and sworn grand jury testimony.

[3] During the relevant time period, Westinghouse was a subsidiary of the Japanese corporation Toshiba.

the transition, Roderick became the Chairman of WEC's board and, by April 2016, was living primarily in Japan. Through 2016 and into 2017, Roderick's involvement with the V.C. Summer Nuclear Project was more limited than Benjamin's, by virtue of Roderick's new responsibilities and primary residence in Japan.

### A.    Benjamin and Roderick's Roles in the V.C. Summer Nuclear Project.

As Senior Vice President for New Plants and Major Projects, Benjamin's principal responsibility was to sell and oversee the construction of WEC's next-generation modular nuclear reactor – the "AP1000." Dkt. No. 2 at ¶ 3. With the AP1000, WEC intended to introduce to the world a nuclear reactor that was affordable and easy to build; initial plans claimed that an AP1000 unit could be built for under $2 billion and substantially completed in as little as 36 months.

In 2013, WEC broke ground on its four U.S. AP1000 reactors – two in South Carolina at the V.C. Summer Nuclear Site ("Unit 2" and "Unit 3"), and two in Georgia at the Vogtle Nuclear Site. At both sites, WEC served as the principal contractor, responsible for the engineering and design of the AP1000, and hired sub-contractors to physically construct the new nuclear units. Dkt. No. 2 at ¶ 12. Benjamin was directly involved in overseeing the development of these units and regularly communicated with high-level owner executives on WEC's behalf about the project status and schedule. *Id.* at ¶ 23. From the beginning, however, the Project was plagued by significant cost and schedule overruns. *Id.* at ¶ 16.

In July 2015, WEC commissioned a third party to conduct an independent assessment and evaluation of the construction schedule for the Project, seeking specifically to estimate the "remaining duration required to complete each unit." *Id.* at ¶ 17. The schedule analysts reported to Benjamin that the schedule was at risk and that the units would most likely be completed at least 13 months behind the current reported completion dates. Benjamin and others at WEC nevertheless

4

assured the Owners that the units would be substantially complete before the tax credit deadline. *Id.* at ¶ 23.

By 2016, WEC and the Owners had negotiated a new contract that placed much of the financial risk for cost and schedule overruns onto WEC, including monetary damages and penalties for failing to meet the projected substantial completion dates or tax credit deadline. *Id.* at ¶ 20. That year, WEC also replaced its primary construction contractor – Chicago Bridge & Iron – with Fluor Enterprises, Inc. ("Fluor"). *Id.* at ¶ 16. Through the second half of 2016 and into early 2017, certain Owner executives began to realize that WEC's schedules were unrealistic and that the tax credits were at great risk. Nevertheless, when Owners' executives confronted Benjamin with questions about the schedule, he and others at WEC assured them that WEC would deliver both units on schedule and in advance of the December 31, 2020 tax credit deadline. *Id.* at ¶ 23, 24, 30.

Throughout 2016, Benjamin's knowledge of the schedule and cost risks continued to grow. As his knowledge grew, so did his efforts to conceal damaging information. When Fluor joined the Project as WEC's construction sub-contractor in January 2016, the parties – WEC, Fluor, and the Owners – understood that Fluor would prepare a new "rebaselined" Project schedule that would provide them all with greater visibility into the costs and time remaining to complete the Project. *Id.* at ¶ 22, 25. In late August 2016, Fluor delivered WEC preliminary results from its rebaselined schedule analysis. *Id.* at ¶ 32. These results showed that Unit 2 would not be completed until August 22, 2022 – three years behind the 2019 completion date that WEC had promised the Owners, and that SCANA had just announced to investors and submitted to regulators in support of a rate increase. *Id.* at ¶ 29, 30, 32. Under the Fluor analysis, the completion date for Unit 3 would be even later, likely another year behind the Unit 2 completion date.

5

Benjamin was informed of these findings. *Id.* at ¶ 33. Benjamin informed subordinates that the dates were "unacceptable," and that he would not authorize any change to the existing schedule. *Id.* at ¶ 32, 33. In defense of its preliminary findings, Fluor sent WEC a letter stating that the current schedule was "unrealistic," that it would be "unethical" to produce schedules "that are not realistic or impracticable," and that relying on "unrealistic schedules will lead to needless expenditure of funds and an overall increase in the cost of the project." *Id.* at ¶ 34. In response, Benjamin authorized a letter to Fluor that instructed the contractor to "[s]top all work on developing [a projected cost] estimate and [] associated schedule . . . as this is not in support of the 'June/June' schedule . . . ." *Id.* at ¶ 38, 39. The WEC "cease and desist" letter further admonished Fluor by stating there is "but one schedule on the project and that schedule is the schedule [WEC has] termed, the June/June schedule." *Id.* at ¶ 38. WEC and Fluor ultimately agreed that Fluor would deliver WEC a new cost estimate for Project completion, but without a new schedule. *Id*. at ¶ 40.

On Wednesday, September 21, 2016, Benjamin attended an "executive summit" with Fluor officials in Aiken, South Carolina to discuss ongoing problems at the V.C. Summer and Votgle sites. In a proposed agenda, Benjamin was identified as giving opening and closing statements. The agenda additionally listed "Problem Statements," which indicated that the relationship between WEC and Fluor was "strained"; the "project productivity and performance is poor, declining, and does not meet project needs"; the performance factor trend "is negative at both sites"; and that the "ETC poses a significant threat to the viability to these projects if not managed properly." Exhibit 15. In an analysis of key milestones, the presentation indicated that Fluor's "sandbox" schedule indicated that Unit 2 was *46 months* behind schedule, with an expected completion date of *August 28, 2023*.

Within two weeks of authorizing the cease-and-desist letter and attending the Aiken "executive summit," Benjamin again told the Owners that both units would be complete on the existing schedule and in advance of the December 31, 2020 tax credit deadline. *Id*. at ¶ 41. Benjamin further told the Owners he expected a rebaselined schedule from Fluor by the end of October 2016. *Id*. at ¶ 42. Benjamin's misrepresentations to the Owners were parroted in SCANA's 10-Q filed in November. Benjamin did not inform the Owners WEC had already ordered Fluor to stop work on the schedule, that Fluor had reached a preliminary prediction of a three-year delay and a Unit 2 completion date of August 2022, and that Fluor's internal calculations predicted an arrival date of *at least another year behind that*. *Id.*

In October 2016, Fluor gave WEC its cost-to-complete estimate. *Id*. at ¶ 45. Fluor estimated that it would cost WEC an additional $9.8 billion to complete the remaining work on all four U.S. AP1000 units. *Id*. WEC assembled its own team to evaluate Fluor's estimate. *Id.* This team concluded that the nuclear construction in South Carolina and Georgia would result in at least a $6 billion loss for WEC. *Id.* According to WEC's own financial analysts, WEC could not survive more than a $2 billion loss. *Id*. at ¶ 47. When Benjamin met with other executives in late December 2016 to discuss Fluor's projected cost estimates, Benjamin insisted—without support and contrary to the formal findings of WEC's own analysts—that WEC was facing only a $3 billion loss. *Id*. at ¶ 49. The next day, Toshiba issued a public statement informing investors and the public that WEC was "evaluating the cost to complete the AP1000 contracts," and that the cost to complete the units will "far surpass original estimates." *Id*. at ¶ 50. The release indicated that the current loss amount was estimated to be $3 billion, based on Benjamin's representations. *Id.* One month later, WEC analysts would confirm that the correct estimate was approximately $6 billion, consistent with its initial findings. *Id*. at ¶ 52.

On February 14, 2017, Benjamin disclosed to the Owners that Toshiba was facing a $6 billion loss, virtually all of which was specifically attributed to WEC's nuclear construction projects in the United States. *Id*. at ¶ 53. Churchman informed the Owners that the units would be slightly delayed, but still delivered in advance of the December 31, 2020 tax credit deadline. *Id*. Both Benjamin and Churchman knew that these dates were extremely unrealistic and virtually impossible to meet.

Following WEC's February 14 disclosures, SCANA filed a Form 8-K report with the SEC. *Id*. at ¶ 54. The filing informed investors that WEC and its parent Toshiba were "committed to completing the two new Westinghouse AP1000 nuclear units being constructed in Jenkinsville, SC" and that the slightly-delayed completion dates still allowed "the units to qualify, under current law, for the federal production tax credits." *Id.* Though SCANA executives Kevin Marsh and Steve Byrne knew by this time that the tax credits were effectively lost, and that this statement was false, Benjamin's false assurances allowed them to parrot misinformation to SCANA's investors, regulators, and ratepayers.

### B.    Mr. Sullivan's Joint Representation of Benjamin and Roderick.

In response to Government inquiries during the pendency of the grand jury investigation, Mr. Sullivan notified the Government that he was representing both Benjamin and Roderick on July 10, 2019. Exhibit 1. During discussions and meetings that followed, the Government informed Mr. Sullivan that his joint representation in the course of the investigation and potential prosecution could present a conflict. On September 3, 2020, the United States Attorney's Office served Mr. Sullivan a target letter for Benjamin and a subject letter for Roderick. *See* Exhibits 2 & 3. The Government attached the letters to an email outlining concerns that Mr. Sullivan's joint representation of Benjamin and Roderick created an actual conflict in violation of SCRPC 1.7. *See*

Exhibit 4. The Government detailed that "it is apparent from the evidence uncovered during the course of the investigation, that Roderick's testimony would be beneficial to the Government and to Roderick himself, in a case against Benjamin" and that "[i]t is also likely that Benjamin has information that informs our case with Roderick, and correspondingly can benefit Benjamin." *Id.* As the Government previously expressed to Mr. Sullivan on numerous occasions, the investigation had revealed that Benjamin's and Roderick's interests were adverse to one another. *Id.* The Government therefore did not believe it was prudent or appropriate for Mr. Sullivan to proceed under joint representation. *Id.*

Mr. Sullivan responded by letter dated September 11, 2020. *See* Exhibit 5. In his letter, Mr. Sullivan disputed that an actual or potential conflict exists because he was "unaware of any incriminating information or evidence that either Mr. Roderick or Mr. Benjamin could or would provide about the other." *Id.* Mr. Sullivan further represented that his clients had knowingly and voluntarily waived any potential conflict of interest. *Id.* Last, Mr. Sullivan stated that his clients did not intend to testify before a grand jury but were willing to "meet with your office for a debriefing session to discuss their knowledge of the V.C. Summer project, in exchange for transactional immunity regarding the subject matter of your investigation."[4] *Id.* On October 22, 2020, the Government served a subpoena requiring Roderick to appear before the grand jury on November 17, 2020. *See* Exhibit 6. Mr. Sullivan responded to the grand jury subpoena on behalf of Roderick by letter dated November 2, 2020. *See* Exhibit 7. In the letter, Mr. Sullivan stated that "Mr. Roderick must now invoke his constitutional Fifth Amendment rights and protections and

---

[4] Prior to the September 11, 2020 letter, Mr. Sullivan made representations to Government counsel requesting blind immunity only for Roderick.

respectfully declines to respond to any questions from the grand jury, and accordingly, he will not appear before it." *Id.*

On November 8, 2020, the Government responded to Mr. Sullivan's letter. *See* Exhibit 8. The Government set forth that the Fifth Amendment did not broadly relieve Roderick from appearing before the grand jury. *Id.* To the contrary, if Roderick intended to invoke his Fifth Amendment rights, he had to do so question-by-question before the grand jury and only where a truthful answer would tend to incriminate him personally. *Id.* The Government expressed concerns about Mr. Sullivan placing Roderick at risk of contempt in order to effectively preclude his testimony about Benjamin's liability. *Id*. Mr. Sullivan's desire for Roderick to avoid an appearance before the grand jury not only illustrated the conflict that "has long been apparent" in his representation of both Benjamin and Roderick but also impeded and obstructed the grand jury investigation. *Id*.

On November 12, 2020, the United States filed an ex parte motion to disqualify Mr. Sullivan and his law firm from participating in the ongoing grand jury investigation. 3:20-mc-00504-MGL. Thereafter, at the Court's direction, the United States redacted, filed, and served its ex parte motion on Mr. Sullivan. In the motion, the United States set forth that Mr. Sullivan's joint representation of Roderick and Benjamin presented an irreconcilable conflict of interest that necessitated Mr. Sullivan's disqualification. *See In re: Matter Occurring Before Grand Jury 3*, 3:20-mc-00504-MGL.

On December 15, 2020, the United States was notified that Roderick had obtained new counsel. On December 22, 2020, the United States filed a motion to withdraw its motion to disqualify Mr. Sullivan and his law firm, recognizing that since Roderick retained new counsel, the immediate conflict of interest under SCRPC 1.7 appeared to be resolved. *Id.* at Dkt. No. 10.

However, in the motion to withdraw, the United States outlined that Mr. Sullivan's continued representation of Benjamin could present additional conflicts under SCRPC 1.9 and therefore reserved its right to raise the arguments contained within the motion to disqualify or any related issues at a later date. *Id*. As the investigation developed, the Government continued to notify Mr. Sullivan of its concerns of an actual conflict under SCRPC 1.9. *See* Exhibits 9 & 10.

### C.    Roderick's Cooperation and Benjamin's Indictment.

On June 16 and July 14, 2021, the FBI interviewed Roderick in the presence of his new attorneys, Whitney Ellerman and Paul Enzinna. *See* Exhibits 11, 12. Roderick's statements inculpated Benjamin and supported the charges that the Government ultimately brought.[5]

Regarding the Project, Roderick confirmed that "Benjamin was responsible for opining on the achievability of [the guaranteed substantial completion dates]." Exhibit 11 at 12. When asked about Benjamin's representations to the Owners in the September 26, 2016 President's Meeting – where Benjamin told the Owners that the units would be complete on the existing schedule in advance of the tax credit deadline and that Fluor would provide a rebaselined schedule by the end of October, despite Fluor's preliminary schedule analysis showing an August 2022 completion date and WEC's "cease and desist" order – Roderick stated that Benjamin was "not fully transparent." Exhibit 12 at 9-10.

Further, Roderick was not informed of Fluor's preliminary findings or the "cease and desist" letter but believes Benjamin should have done more to investigate Fluor's findings and concerns. *Id.* Roderick said that in 2016, he believed the schedule was being rebaselined because Benjamin and others told him so. *Id.* at 2. Roderick says Benjamin should not have "pinned" the

---

[5] The following statements are excerpted from the FBI reports of interview, which were reviewed and approved by Roderick in the presence of his current counsel. *See* Exhibits 11, 12.

schedule to fixed dates, especially after Benjamin learned about Fluor's August 2022 preliminary

schedule finding. *Id.* at 9. Roderick's memorandum of interview reflects his reaction when asked

about Fluor's preliminary schedule analysis:

> Nobody informed Roderick that Fluor had calculated a preliminary
> substantial completion date (SCD) of August 2022 for Unit 2 at VC
> Summer. Roderick was not informed of that date during a WEC
> meeting in Washington D.C. on 12/7/2016. If Benjamin was
> informed of the August 2022 SCD, then Benjamin should have had
> that date vetted. If accurate, then Benjamin should have reported that
> end date to Roderick and Gutierrez because of the material impact
> to WEC's financials. A vetted August 2022 SCD was a disclosable
> event to the Owners and the financial community.

*Id.* at 9-10. Roderick stated that that around the time of the "cease and desist" letter, he believes

Benjamin and Carl Churchman "lied to him about what was being done with the schedule."[6]

Exhibit 12 at 9. As memorialized in his memorandum of interview, Roderick stated:

> Roderick believes that around the time of the [cease and desist
> letter], Benjamin and Churchman had lied to him about what was
> being done with the schedule. Certainly by that time there was
> enough information about the schedule where WEC needed to "dig
> in deeper to see what was going on." Roderick should have been
> brought in that process due to the level of "noise happening" on the
> schedule between WEC and Fluor. Benjamin and Churchman
> should have brought in a team to figure out if there was more to what
> Fluor was saying about the schedule. Gutierrez should have
> informed the Owners that Fluor had challenged the schedule, there
> was information that might push out the schedule, and WEC was
> still rebaselining.

*Id.*

More generally, Roderick described Benjamin as contentious, abrasive, and overbearing.

Exhibit 11 at 4, 12. Roderick further explained that Benjamin was the only person in the company

---

[6] Carl Churchman has pleaded guilty to one count of violating 18 U.S.C. § 1001 and is currently
cooperating in Benjamin's prosecution. *See United States v. Churchman*, No. 3:21-cr-00278-
MGL.

who had to be reprimanded for creating a "culture of fear." *Id.* at 13. Roderick stated that over time, Benjamin's management style had become "unbearable." *Id*. Roderick explained that if he knew when he was managing Benjamin what he knows now, he "would have moved faster to remove Benjamin." *Id.* Roderick explained that Benjamin could be aggressive when put in a stressful situation, and his response to stress was "exponentially bad." *Id.*

On August 18, 2021, the grand jury returned an indictment charging Benjamin with conspiracy to commit mail fraud, wire fraud, and securities fraud in violation of 18 U.S.C. § 1349, thirteen counts of wire fraud in violation of 18 U.S.C. § 1343, one count of securities fraud in violation of 18 U.S.C. § 1348(1) and failing to keep accurate corporate records in violation of 15 U.S.C. § 78m(b)(2)(A). *United States v. Benjamin*, 3:21-cr-00525-MGL. The indictment relies in part on Roderick's statements, and the Government intends to call Roderick as a material witness at Benjamin's trial. Following the indictment, the Government informed Mr. Sullivan and local counsel that although it did not oppose Mr. Sullivan's motion to be admitted pro hac vice, it "believe[d] that he has a conflict in this case under SCRPC 1.9, due to his previous representation of Danny Roderick" and intended to raise the issue with the Court. Exhibit 13.

### D. The Government's Notice of Intent to File the Instant Motion and Roderick and Benjamin's Resulting "Waivers."

On October 14, 2021, the Government informed Mr. Sullivan of its intent to renew its motion to disqualify him and his law firm from representing Benjamin. Mr. Sullivan then notified the Government that he had obtained signed waivers from Benjamin and Roderick, which he believed resolved the actual conflicts of interest. Following a request by the Government, Mr. Sullivan provided copies of Roderick and Benjamin's signed waivers, as well as an additional declaration from Benjamin. Exhibits 16-18. Thereafter, the Government requested a copy of

Benjamin's engagement letter, referenced in his signed waiver, and on November 2, 2021, Mr. Sullivan provided a redacted portion of the engagement letter. Exhibit 19.

In the waiver signed by Roderick on October 26, 2021, Roderick states that he believes his and Benjamin's interests are not adverse and that he does not have direct personal knowledge of any facts that he believes indicate "any criminal culpability" on Benjamin's part. Exhibit 16 at ¶ 12. Nevertheless, Roderick acknowledges the potential or actual conflicts of interest created by Mr. Sullivan's joint representation of him and Benjamin and the continuing duties of loyalty and confidentiality owed to them both. *Id.* at ¶ 13. Notwithstanding his acknowledgement of the conflicts of interest, Roderick consents to Mr. Sullivan and the law firm's use of any confidential information received by them during the course of their representation, including such use during cross-examination if Roderick were to testify in a trial against Benjamin. *Id.* at ¶ 15.

In Benjamin's waiver, signed October 22, 2021, he similarly acknowledges the conflicts of interest involved in Mr. Sullivan and his law firm's continued representation. Exhibit 17 at ¶ 13. Nevertheless, Benjamin states that "after carefully considering all possible present and future potential or actual conflicts of interest – and having been fully informed of potential negative or adverse, legal or tactical consequences arising from the former joint representation – I have decided to continue my attorney-client relationship" with Mr. Sullivan and the law firm. *Id.* at ¶ 16. Benjamin further expressly and knowingly waives any conflict arising from the former joint representation. *Id.* at ¶ 17. The Government shared copies of the signed waivers, Benjamin's additional declaration, and the redacted portion of the engagement letter with its expert, Professor Nathan Crystal. Professor Crystal reviewed the documents and produced the attached declaration in support of the Government's motion. Exhibits 14, 14a, and 14b.

## II.     ARGUMENT

"Some conflicts – whether actual or potential – are so severe that they cannot be waived[.]" *United States v. Crinel*, Case No. 15-cr-61, 2015 WL 4394158, at *4 (E.D. La. July 15, 2015) (citing *United States v. Wheat*, 486 U.S. 153, 163 (1988)). For this reason, district courts "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163.

Here, Mr. Sullivan and his law firm must be disqualified from further representation because, notwithstanding the "waivers" that he has obtained, Mr. Sullivan's continued representation of Benjamin creates a significant, looming, and unresolvable risk of conflict at trial. The Fourth Circuit – and, indeed, courts around the country – have held such circumstances, in which an attorney seeks to cross-examine a former client about the subject matter of that client's representation, to present non-waivable conflicts of interest. This case is no different. Because Mr. Sullivan's ongoing representation of Benjamin presents a significant likelihood of an actual conflict in violation of the Sixth Amendment, the Court should disqualify Mr. Sullivan and PWSP from the case.[7]

---

[7] In its communications with Mr. Sullivan over the last two years, the Government repeatedly expressed concerns that his representation of Roderick and Benjamin violated SCRPC 1.7 and 1.9.

SCRPC Rule 1.9 provides as follows:

RULE 1.9: DUTIES TO FORMER CLIENTS

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

A.    **The Sixth Amendment Requires a Review of Counsel's Conflicts.**

The Sixth Amendment establishes the right to assistance of counsel in "all criminal prosecutions," which includes the right to counsel unimpaired by conflicting loyalties. *See Powell v. Alabama*, 287 U.S. 45, 59 (1932); *see also Glasser v. United States*, 315 U.S. 60, 70 (1942) ("[T]he '[a]ssistance of [c]ounsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests."). "[C]ounsel owes the client a duty of loyalty, a duty to avoid conflicts of interest," which is "perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984).

---

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

In light of the signed waivers provided to the Government on October 27, 2021, it appears that Mr. Sullivan has obtained informed consent, confirmed in writing, as required under Rule 1.9(b). Nevertheless, as fully set forth below, the Government believes the conflicts presented under these circumstances are unwaivable.

District courts enjoy substantial discretion in determining whether conflicts of interest exist, and whether to accept any proposed waiver of such conflicts. *See United States v. Urutyan*, 564 F.3d 679, 485-86 (4th Cir. 2009); *see generally Wheat*, 486 U.S. 153. While courts of course consider a defendant's preference for particular counsel, any such presumption "may be overcome not only by a demonstration of actual conflict but by a showing of *serious potential for conflict*." *United States v. Basham*, 561 F.3d 302, 323 (4th Cir. 2009) (emphasis in original; internal citation omitted); *see also State v. Sanders*, 341 S.C. 386, 389, 534 S.E.2d 696, 697 (2000) (observing that "the Sixth Amendment does not confer an absolute right to be represented by one's preferred attorney"). In sum, "a district court has an obligation to foresee problems over representation that might arise at trial and head them off beforehand." *Id.* (quoting *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997)). Thus, a "district court is free to disqualify counsel even if the defendant is willing to waive a conflict of interest because of the judiciary's 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Id.* (quoting *Wheat*, 486 U.S. at 160).

The representation of multiple clients in a single proceeding increases the likelihood of both actual and potential conflicts. *See Wheat*, 486 U.S. at 164 (noting that "multiple representation of criminal defendants engenders special dangers of which a court must be aware"). In determining the existence of an actual conflict or of a serious potential for an actual conflict, courts often look in part to the relevant body of professional rules. *See, e.g.*, *Miller*, 624 F.2d at 1201 (court should disqualify attorney when it determines, based upon factual circumstances, that disqualification is appropriate means to enforce applicable disciplinary rule). However, state ethical rules are, as the Supreme Court has noted, "only guides" in the context of the Constitutional right to counsel.

*Strickland*, 466 U.S. at 688. Thus, compliance with a state ethical rule will not always satisfy the Sixth Amendment. *Id.*

More specifically, "[a]n attorney who cross-examines former clients inherently encounters divided loyalties." *United States v. Voigt*, 89 F.3d 1050, 1078 (3d Cir. 1996) (internal citation omitted). In such circumstances, an attorney's "zeal in defense of his client the accused is thus counterpoised against solicitude for his client the witness." *Castillo v. Estelle*, 504 F.2d 1243, 1245 (5th Cir. 1974). Such a scenario may create risks "that no attorney should accept and that no court should countenance, much less create." *Id.* Indeed, the Fourth Circuit – among other circuit courts – has found the existence of actual and/or potential conflicts where attorneys sought to cross-examine their current and former clients. And again, because courts regularly deem such conflicts non-waivable, those counsel were accordingly disqualified. *See, e.g.*, *United States v. Williams*, 81 F.3d 1321, 1324-25 (4th Cir. 1996) (disqualification proper where attorney had already represented, and might again represent, two other members of alleged conspiracy); *Hoffman v. Leeke*, 903 F.2d 280, 288-90 (4th Cir. 1990) (reversing district court for *failure* to disqualify counsel who had represented prosecution witness in prior trial); *see also, e.g.*, *United States v. Voigt*, 89 F.3d 1050, 1078-79 (3d Cir. 1996) (disqualification appropriate where there was "strong possibility" that witness would "face cross-examination by [his] former attorney" that had represented him "for purposes of responding to the grand jury subpoenas").

### B.    Mr. Sullivan's Conflict Cannot be Waived and Disqualification is Appropriate.

Here, Mr. Sullivan's continued representation of Benjamin poses a significant risk of conflict at trial. Mr. Sullivan and PWSP previously represented Roderick in the same matter and, during that prior representation, Mr. Sullivan shared a privilege with Roderick and learned confidential information about Roderick's knowledge of, and involvement in, the facts of this case.

*See Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 730 (E.D. Va. 1990) ("[O]nce an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter."). Further, in the course of that representation, Mr. Sullivan learned privileged information from Roderick that he or his law firm could use to impeach Roderick on cross-examination. *See id.* ("[I]f the lawyer could have obtained confidential information in the first representation that would have been relevant in the second, then the matters are considered substantially related.").[8]

In *United States v. Williams*, the Fourth Circuit upheld a district court's disqualification of an attorney under similar circumstances to those here. Williams was accused of writing fraudulent checks and depositing them into his girlfriend Martin's bank account, then withdrawing money from the account. 81 F.3d 1321, 1322 (4th Cir. 1996). The FBI opened an investigation, and Williams and Martin married the following year. *Id.* at 1323. Martin retained an attorney to represent her in the investigation. *Id.* Thereafter, the Government indicted Williams and decided not to charge Martin but to call her as a witness against Williams instead. *Id.* Williams sought representation from the same attorney who represented Martin in the investigation, and the Government moved for his disqualification. *Id.* The district court found that there was an obvious conflict of interest, notwithstanding Martin's desire not to testify and the lawyer's willingness to obtain auxiliary counsel to cross-examine Martin. *Id.* The district court disqualified counsel. *Id.*

On appeal, the Fourth Circuit held that the district court's decision to disqualify counsel was squarely within its discretion, recognizing the threat the lawyer's "former representation necessarily posed to his ability to conduct effective and fair cross-examination of the potential

---

[8] In fact, in his waiver, Roderick expressly states that PWSP can use confidential information shared during the course of the representation, including during cross-examination, despite the duties owed to him as a former client. *See* Exhibit 16 at ¶ 15.

witness." *Id.* at 1324-25. The *Williams* court identified that a potential conflict exists when there is a risk that the lawyer would improperly use privileged information during cross-examination or would fail to effectively cross-examine the witness. *Id.* The court explained that even when clients may offer to waive a conflict, the court "must yet be free to insist on separate representation in order to vindicate its own 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Id.* at 1324.

Cases within the Fourth Circuit applying the principles espoused in *Wheat* and *Williams* are also instructive and reveal that disqualification is necessary. *See, e.g.*, *United States v. Cortez*, 205 F. Supp. 768 (E.D. Va. 2016); *United States v. Hoback*, 2018 WL 3639835 (W.D. Va. 2018). In *Hoback*, the defendant's counsel previously represented a material witness for the government who was a cooperating, unindicted co-conspirator under the government's theory of the case. 2018 WL 3639835 at *1. The court found that the attorney had formed an attorney-client relationship with the witness, the witness and defendant's interests were materially adverse, and the past and present representations were related. *Id.* at *2. Under these circumstances, the court found that there was, at a minimum, a serious potential for a conflict of interest. *Id.* Although both the witness and defendant waived the conflict, the court recognized that it had a separate duty under the Sixth Amendment to weigh the defendant's rights to conflict-free counsel and counsel of choice against the judiciary's independent duty to safeguard the integrity of criminal proceedings. *Id.* at *3. The court found that when confidentiality conflicts with the right to choose counsel, "confidentiality prevails." *Id.* (quoting *Tessier*, 731 F. Supp. at 729). Thus, the court concluded that the waivers were not sufficient to remedy the serious potential for conflict of interest but that "disqualification [was] necessary to safeguard the integrity of the criminal proceedings." *Id.*

20

So too here. *Williams* and its progeny make clear that Mr. Sullivan's continued representation of Benjamin creates, at a minimum, a serious potential for conflict of interest. As explained above, the Government intends to call Roderick as a witness to elicit testimony against Benjamin consistent with the information Roderick provided to the FBI. *See Voigt*, 89 F.3d at 1078 ("an[y] attorney who cross-examines former clients inherently encounters divided loyalties") (citing *United States v. Moscony*, 927 F.2d 742, 750 (3d Cir. 1991)); *see also Malpiedi*, 62 F.3d 465. In *Williams*, the court placed great emphasis on the threat that the conflicted lawyer's "former representation necessarily posed to his ability to conduct effective and fair cross-examination of the potential witness." 81 F.3d at 1325 (citing *United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994)).[9] If Mr. Sullivan or his law firm avoid certain lines of inquiry upon Roderick's cross-examination so as to avoid any appearance of impropriety, they may deny Benjamin his right to adequate representation. Mr. Sullivan would "face an intolerable choice between (i) pulling punches on cross-examination, or (ii) undermining the admissibility, credibility, and weight of [Roderick's] testimony." *Cortez*, 205 F. Supp. 2d at 777. Mr. Sullivan's obligation to zealously defend Benjamin is therefore in direct conflict with his obligation to maintain his duty of loyalty and confidentiality to Roderick, and no waiver can overcome this deficiency in the proceedings.

Nor do Mr. Sullivan's waivers cure the conflict that his continued representation presents. The Government's concerns regarding Mr. Sullivan and PWSP's cross-examination of their

---

[9] SCRPC 1.7(a)(2) similarly prohibits representation where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a former client. . . ." As explained in Comment 8 to that rule, "a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Because Mr. Sullivan cannot "carry out" an effective cross-examination of Roderick – an adverse and critical Government witness – he necessarily has a conflict of interest on the case, one that impacts Benjamin's Sixth Amendment rights.

former client only scratch the surface of potential problems at a forthcoming trial. The contours of such a cross-examination are unclear, but at least some of the myriad potential conflicts are foreseeable:

- If, for example, Roderick testifies consistently with his statements to FBI – thus implicating Benjamin – Paragraph 15 of Roderick's "waiver" expressly allows Mr. Sullivan to impeach him with otherwise privileged or confidential information from the prior representation or with the language of the waiver itself.

- In such a scenario, the defense will be obligated to provide any prior statement made by Roderick to Mr. Sullivan and PWSP under Rule 26.2 of the Federal Rules of Criminal Procedure. The Court will need to determine the scope of the privilege waiver embedded in Paragraph 15, and its effect on Roderick's examination and the scope of available discovery.

- This effort will be made more complicated by the joint defense agreement Roderick shared with Benjamin, who could be disadvantaged by the production of privileged and confidential information regarding Roderick's representation.

- Whether or not the defense produces a prior statement under Rule 26.2, if Mr. Sullivan and PWSP intend to impeach Roderick using privileged or confidential information from the prior representation, they will be doing so based on their own personal knowledge and recollections, which makes them necessary witnesses to the prior statement. This would present an entirely different conflict issue under SCRCP 3.7 ("Lawyer as Witness").

- Given that Mr. Sullivan and PWSP represented Roderick for nearly a year, during which time they knew the focus and scope of the Government's investigation, it is unlikely that there are any material subjects Roderick may testify to that he did not previously discuss with Mr. Sullivan and PWSP.

- Accordingly, if Mr. Sullivan and PWSP cross-examine Roderick, they will unavoidably have access to information about his testimony learned within the scope of the prior representation. If they use this knowledge against him, it will trigger new discovery obligations, invite an extended privilege waiver analysis that could have negative implications for Benjamin, and raise a potential new disqualifying conflict under Rule 3.7.

- On the other hand, if Mr. Sullivan and PWSP choose not to cross-examine Roderick about matters within the scope of their prior representation, they will forego an opportunity to impeach an adverse Government witness and compromise Benjamin's Sixth Amendment rights.

Neither the Court nor the Government can predict every conflict that may unfold as this case proceeds to trial. But this "intolerable choice," created by Mr. Sullivan, is unavoidable. *Cortez*, 205 F. Supp. 2d at 777. As the Supreme Court recognized in *Wheat*, the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand." *Wheat*, 486 U.S. at 162-63. "Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them." *Id.* at 163.

Mr. Sullivan and PWSP's continued representation of Benjamin would create significant trial, appellate, and post-conviction consequences that will inevitably follow should Benjamin be convicted. *See Wheat*, 486 U.S. at 161-62 ("Nor does a waiver by the defendant necessarily solve the problem, for we note, without passing judgment on, the apparent willingness of Courts of Appeals to entertain ineffective-assistance claims from defendants who have specifically waived the right to conflict-free counsel."); *Hoffman*, 903 F.2d at 288 (applying *Wheat* to the point of reversing for abuse of discretion a district court's refusal to disqualify because of party waiver when the conflict was "obvious and palpable"). Practically, the Court must decide whether to exercise its discretion to cure the ethical deficiencies present and protect the integrity of the judicial process. *Williams*, 81 F.3d at 1324 ("[C]ourt[s] must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal either on right-to-counsel grounds if it disqualifies the defendant's chosen lawyer, or on ineffective-assistance grounds if it permits conflict-infected representation of the defendant.").

III.    CONCLUSION

Given the materially adverse interests of Roderick and Benjamin, Mr. Sullivan and PWSP's continued representation of Benjamin violates the Sixth Amendment. Therefore, the Government requests that the Court grant its motion to disqualify Mr. Sullivan and PWSP.

**[SIGNATURE BLOCK FOLLOWING]**

Respectfully submitted,

M. RHETT DEHART
ACTING UNITED STATES ATTORNEY

By:    /s/*Emily E. Limehouse*
        EMILY E. LIMEHOUSE (#12300)
        BROOK B. ANDREWS (#10231)
        WINSTON D. HOLLIDAY, JR. (#7597)
        Assistant United States Attorneys
        151 Meeting Street, Suite 200
        Charleston, SC 29401
        Telephone (843) 266-1663
        Facsimile  (843) 727-4443
        Email:    Emily.Limehouse@usdoj.gov

*Attorneys for the United States of America*

November 15, 2021