**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:21CR525 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| JEFFREY ALAN BENJAMIN | ) | **SUPPORT OF DEFENDANT'S** |
| | ) | **MOTION TO TRANSFER VENUE** |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Defendant Jeffrey Alan Benjamin, through undersigned counsel, submits this

Memorandum in support of his Motion to Transfer Venue under the Sixth Amendment and

Federal Rule of Criminal Procedure 18.

## **INTRODUCTION**

The very first paragraph of the indictment against Mr. Benjamin ("Indictment") declares

that every SCANA or Santee Cooper ratepayer, investor, and bondholder suffered direct

financial harm from the alleged conspiracy around the V.C. Summer Nuclear Project ("Project").

Accordingly, the government's position is that nearly all the jury pool in Columbia, South

Carolina are victims of Mr. Benjamin's alleged fraud, because those individuals ultimately bore

the cost of the Project's cancellation.

The government's explicit portrayal of ratepayers as victims will make it all but

impossible to find and identify unbiased jurors from those areas of South Carolina where

SCANA or Santee Cooper was the dominant electrical utility during the Project.  Further, even if

SCANA and Santee Cooper ratepayers, investors, bondholders, *and* all their relatives and close

friends can be excluded from the venire, the few remaining potential jurors in Columbia would

not be impartial.  Because of the Project's economic effect on the area, the years-long negative

press coverage of the Project, and related litigation in the Columbia courthouse, the few remaining potential jurors are highly likely to be biased against Mr. Benjamin.

Accordingly, protecting Mr. Benjamin's fundamental Sixth Amendment right to a constitutionally acceptable, impartial jury, requires transferring venue for this matter to the Greenville Division of this District.  Greenville's jury pool lacks the same large proportion of SCANA ratepayers that make up Columbia's jury pool and has not been subject to the volume of negative press coverage as has the Columbia area.  That fundamental difference will ensure that a truly unbiased jury can be empaneled from a pool of individuals who the government does not allege were themselves personally victimized by Mr. Benjamin or had relatives, friends, neighbors, or coworkers who were.  That is why trying this case in Greenville would mitigate the intolerable risk of undue prejudice against Mr. Benjamin.

As noted above, such a transfer would also reduce the potential for juror bias based on years of pervasive, negative press coverage regarding the failure of the Project. Given the high proportion of SCANA ratepayers in the counties from which the Columbia division draws it juries, a Columbia jury pool is likely to be keenly aware of that pervasive negative press coverage, which will not have the same pervasive effect in the Greenville area, with its lower proportion of SCANA ratepayers.  Consequently, transferring the case to Greenville before *voir dire* is the only effective way to safeguard the integrity of the trial and to avoid onerous and unproductive individualized *voir dire* proceedings—proceedings which would require nearly every potential juror with relationships or associations with alleged victims or status as alleged victims themselves to be removed from the jury pool.

**RELEVANT FACTS**

I.    **The Government Claims That Most Members of the Jury Pool Are Victims of the Alleged Fraud.**

Throughout the Indictment, the government alleged at every opportunity that the ratepayers of SCANA and Santee Cooper were the ultimate victims of Mr. Benjamin's purported fraud:

> "JEFFREY ALAN BENJAMIN, and others, deceived the Owners, regulators, investors, **and ratepayers** . . . . The defendant's misrepresentations and omissions, as well as the associated cover-up, resulted in billions of dollars of loss to the Owners, **ratepayers**, and investors." Indictment ¶ 1 (emphasis added).

> "JEFFREY ALAN BENJAMIN, and others, through Westinghouse, engaged in a scheme, plan, and artifice to defraud the Owners and **ratepayers** . . . ." Indictment ¶ 60 (emphasis added).

> "The object of the conspiracy was for the defendant, JEFFREY ALAN BENJAMIN, and others, through Westinghouse, to provide false representations and omit necessary facts in disclosures to the PSC, the ORS, the South Carolina state government, the Owners, SCANA investors, and to **ratepayers**." Indictment ¶ 62 (emphasis added).

Based on these allegations, the government will argue that, at minimum, over one million South Carolinians—including a vast majority of the potential jury pool—were personally victimized and financially harmed by Mr. Benjamin's alleged participation in a conspiracy. Indeed, out of the approximately 3 million adults in South Carolina, approximately 25% are ratepayers in areas serviced by SCANA,[1] while another 7% are Santee Cooper ratepayers. *See*

---

[1] SCANA merged with Dominion Energy in early 2019, so households formerly serviced by SCANA are now Dominion ratepayers. *Dominion Completes Buyout of SCANA After 17-Month Nuclear Fiasco*, THE STATE (January 2, 2019), https://www.thestate.com/news/politics-government/article223761640.html.  For the purposes of this memo, Dominion ratepayers are assumed to be former SCANA ratepayers who would have been affected by the rate increases tied to the Project and would benefit from any rate relief obtained for SCANA ratepayers.

"SC Energy Data" ENERGY.SC.GOV (https://energy.sc.gov/node/3072). These alleged ratepayer

victims are overrepresented in the counties that comprise Jury Area B, from which the Columbia

Division draws its juries, because Dominion Energy is the primary electricity provider in the

counties that make up the Columbia Division's jury area. *See* "SC Energy Data – Electric Utility

Service Areas" ENERGY.GOV (https://energy.sc.gov/node/3071).  Thus, the government alleges

that most of the adults who are eligible to serve on a jury in the Columbia Division were direct

victims of Mr. Benjamin's alleged fraud because they are or formerly were SCANA or Santee

Cooper ratepayers who paid increased electricity rates during the life of the V.C. Summer

Project, and  any potential jurors who are friends or relatives of the alleged victims would also

need to be excused for cause, further reducing the universe of potential unbiased jurors in the

Columbia Division's jury area.  In contrast, the Greenville Division draws its jurors from Jury

Area A, which is primarily serviced by Duke Energy Carolinas and has relatively few areas

where SCANA or Santee Cooper are the primary electricity provider--indeed, in Jury Area A,

approximately 97% of the population lives in areas serviced by Duke Energy Carolinas, while

nearly 60% of the population of Jury Area B lives in areas serviced by SCANA.  *See* "SC Energy

Data" ENERGY.SC.GOV (https://energy.sc.gov/node/3072).

Beyond ratepayers, the government also contends that investors were victims of Mr.

Benjamin's alleged fraud.  SCANA was the only Fortune 500 company headquartered in South

Carolina, with over 23,000 shareholders, including many of its nearly 6,000 employees.  *See*

SCANA Corporation 2017 Form 10-K Annual Report, SECURITIES AND EXCHANGE COMMISSION

(https://www.sec.gov/Archives/edgar/data/91882/000075473718000115/a12312017-10k.htm).

The ultimate bankruptcy of SCANA and its subsequent merger with Dominion in 2019 had

wide-ranging and well publicized effects on South Carolina's economy that affected hundreds of

thousands of ratepayers, investors, and SCANA employees, not to mention those affected in many other ways by the failed VC Summer project. Many of those harmed because of their investments in SCANA have brought civil litigation in Columbia documenting the extent of their injuries. *See, e.g.*, *Norman v. SCANA Corporation et al*, Case No. 3:17-cv-02616-MBS (D.S.C.).

Santee Cooper, as a state-owned entity, does not have shareholders, but it did issue bonds to fund the V.C. Summer construction. Santee Cooper bondholders have also brought civil litigation detailing their injuries arising from the V.C. Summer Project. *See, e.g.*, *Turka v. South Carolina Public Service Authority et al.*, Case No. 2:19-cv-1102-RMG (D.S.C.).

Moreover, given the prominence of SCANA and Santee Cooper in the local economy, even potential jurors who were not directly victimized by financial injury will come to the trial having already pre-judged the nature of the Project's failure and, potentially, Mr. Benjamin's role in that failure, especially given the significant negative coverage of the Project in the local press. The significant local interest Columbia Division jurors had in the success of the Project, combined with their proximity to the state's capital, means that they are also far more likely to have had their opinions shaped by negative coverage of the Project by press centered in the Columbia capital region. Indeed, the press and elected officials in South Carolina have repeatedly emphasized the financial harm done to South Carolinians—and SCANA and Santee Cooper customers in particular—by the cancellation of the V.C. Summer Project:

- "The abrupt end to a project customers have been funding since 2009 put about 6,000 people out of work. Employees of more than 100 contractors say they were given just minutes Monday to collect their belongings and leave…People are walking out on their leases. Business will suffer immensely." Seanna Adcox, *Workers, lawmakers angry over nuclear plant debacle*, Associated Press (Aug. 2, 2017), https://apnews.com/article/812a08838617434bbf8b0936cf9efdf1.

5

- "The PSC has so far approved nine rate hikes to pay for the reactors, under the provisions of the BLRA. SCE&G estimates that utility customers will be paying that project off for another 60 years." *Nuclear debacle needs special session*, Post & Courier (Aug. 6, 2017), https://www.postandcourier.com/opinion/editorials/special-session-for-nuclear-disaster/article_a413dd4c-7966-11e7-ae83-ab12a5e91ed9.html.

- "[R]oughly 180,000 ratepayers could end up on the hook for as much as $52,000 per customer to be paid off over the next three decades…Obviously, such an incredible burden on thousands of South Carolina households and businesses would be a devastating drag on the state's economy." *Santee Cooper customers are vulnerable too*, Post & Courier (July 1, 2019), https://www.postandcourier.com/opinion/editorials/ 6 antee-cooper-customers-are-vulnerable-too/article_2fbd5e3a-796c-11e8-93a7-8be8a0de94e1.html.

- "More than 3,000 construction workers lost their jobs when SCANA abandoned its nuclear project." John Monk, *SC Judge Tells Ex-SCANA CEO His Nuclear Crime Is 'Much Larger Than' His Guilty Plea*, The State (Oct. 11, 2021, 3:03 PM), https://www.yahoo.com/now/sc-judge-tells-ex-scana-190301388.html.

The consequence of the government's allegations is that a large majority of the Columbia Division jury pool is explicitly alleged to have been directly victimized by Mr. Benjamin's alleged fraud and to have suffered financial harm.  Mr. Benjamin—not some faceless corporate entity—stands accused, however wrongfully, of personally harming these people.

## II.    Potential Jurors Have Been Inundated with Overwhelmingly Disparaging Press Coverage About the Project for Years.

Even those in the Columbia Division jury pool who the government does not contend were direct victims of Mr. Benjamin's alleged fraud have been exposed to a deluge of pejorative press coverage of the V.C. Summer Project for more than a decade.  From the start, the Project

6

was plagued by jaundiced press reporting that has left potential jurors with the impression that

the Project was a mistake and potentially fraudulent from the beginning.  The effect of such press

coverage is even greater in the Columbia region than elsewhere in the state given Columbia's

role as the state capital and venue for other litigation arising out of the Project's failure,

including criminal proceedings against two SCANA executives.  Indeed, with all this coverage

taking place in the area from which the Columbia Division draws its jury pool, potential jurors in

this Division will have been inundated with accounts of other investigations and litigation related

to the Project and may conflate the facts here with those from other proceedings.  The

overwhelmingly negative press coverage, combined with the high proportion of SCANA

ratepayers in the Columbia Division's jury pool, makes it virtually impossible for Mr. Benjamin

to receive a fair trial before an unbiased jury in the Columbia Division.

Hostile reporting on the Project has continued to saturate the Columbia region in the

years since the Project's cancellation.  For instance, the V.C. Summer Project relied on utility

rate increases for funding under the Base Load Review Act, S.C. Code § 58-33-210, *et seq.*,

which has been called "a perverse piece of legislation"[2] and "the gift that keeps on giving to the

utility and keeps on taking from customers."[3] *See* Andrew Brown, *Stamped for Failure:*

*Westinghouse and SCANA used unlicensed workers to design abandoned S.C. nuclear reactors*,

Post and Courier (Sept. 24, 2017) https://www.postandcourier.com/business/stamped-for-failure-

westinghouse-and-scana-used-unlicensed-workers-to-design-abandoned-s-c-

---

[2] *Guilty plea won't undo VC Summer damage, but these reforms would help in the future*, Post & Courier (June 13, 2020) (https://www.postandcourier.com/opinion/editorials/editorial-guilty-plea-wont-undo-vc-summer-damage-but-these-reforms-would-help-in-the/article_efb53c66-aa6c-11ea-932c-8748802d67fb.html).

[3] *All SCE&G customers should get refunds, lawyers tell SC judge*, The State (April 30, 2018, 2:59 PM) (https://www.thestate.com/news/local/crime/article210128169.html).

nuclear/article_3ea2046a-9d39-11e7-a186-cb396c86b8b9.html (alleging that Westinghouse and SCANA hired unlicensed engineers in a "potentially criminal shortcut" and that the project was a "race to the bottom" from the start).

Several articles have opined on the very issues being raised in this case about the knowledge and intentions of Project management, with unfounded editorials and unproven allegations being presented as facts to Columbia readers:

- "We embarked on a multi-year, multi-billion project with a road map that we didn't really believe was going to get us to the destination[.]" *SCE&G got state's OK for doomed nuclear project without a construction schedule*, The State (Aug. 23, 2017, 12:00 PM), https://www.thestate.com/news/politics-government/article168857122.html (quoting Rep. Kirkman Finlay).

- "[SCANA and Santee Cooper] knew things were going badly. They feared blowback that would result if the information went public. And they chose to keep it secret and proceed with the reactor construction as if nothing were wrong . . . . They remained silent while leading South Carolina into an economic disaster from which it could spend years or even decades recovering." *'Disclose or not' memo suggests nuclear project cover-up*, Post & Courier (Sept. 2, 2018) https://www.postandcourier.com/opinion/editorials/editorial-disclose-or-not-memo-suggests-sc-nuclear-project-cover/article_463fb0f2-aaf6-11e8-8b9c-538728171093.html.

- "[P]artnering utilities knew of significant flaws with their primary contractor Westinghouse, but continued to tout the reactors being built at the V.C. Summer site and advocate for additional funding for a project already years behind schedule." Andrew Brown, *Audit highlighted problems with South Carolina nuclear project a year before cancellation*, Post and Courier (Sept. 4, 2017) https://www.postandcourier.com/news/audit-highlighted-problems-with-south-carolina-nuclear-project-a-year-before-cancellation/article_9ac96112-9185-11e7-9979-977331ac2233.html.

- "But in the years that followed, SCANA and Santee Cooper officials put on a public face that gave little hint to the behind the scenes turmoil. They continually reassured lawmakers, regulators, and the public that the project was in the best interest of the state. They

8

increased the overall budget by billions of dollars. And they collected billions more from customers to cover financing costs for the yet-untested reactors." Andrew Brown, *Letter shows S.C. utilities knew Westinghouse's reactor designs would lead to increased costs and schedule delays*, Post and Courier (Sept. 29, 2017) https://www.postandcourier.com/politics/letter-shows-s-c-utilities-knew-westinghouses-reactor-designs-would-lead-to-increased-costs-and/article_5a3e00ee-a526-11e7-bb9c-77f23998537d.html.

- And following the Project's cancellation in 2017, the media was quick to point out the many ways the Project's ultimate failure harmed the very individuals that would make up the jury pool here:"The end of the project is likely to cost thousands of workers their jobs and leave customers wondering if they will be reimbursed for the money they already have spent on the effort. SCE&G customers have paid $1.4 billion through higher monthly utility bills as a result of nine different rate increases." *SCE&G, Santee Cooper abandon nuclear power project*, The State (July 31, 2017, 12:50 PM), https://www.thestate.com/news/local/article164544862.html.

- "The utilities have blamed the project's collapse on the bankruptcy of the project's contractor, Westinghouse; spiraling delays; and construction delays." Santee Cooper CEO retires amid SC nuclear fiasco, The State (Aug. 25, 2017 11:16 AM), https://www.thestate.com/news/politics-government/article169317737.html.

- "[V]ast piles of equipment and parts still lie unused, exposed to the elements and rusting away. Those costs could be passed on to millions of SCANA and Santee Cooper customer in the coming decades. SCANA's more than 700,000 electric customers already pay $37 million a month, or 18 percent of their bill, for the $9 billion unfinished reactors." Andrew Brown, *Contractor wasted millions on unnecessary supplies for S.C.'s failed nuclear reactors*, Post and Courier (Nov. 5, 2017) https://www.postandcourier.com/news/contractor-wasted-millions-on-unnecessary-supplies-for-s-c-s-failed-nuclear-reactors/article_43eeba82-ba6f-11e7-8065-2398b073b4e0.html.

- "South Carolinians got taken to the cleaners in the V.C. Summer nuclear debacle. Those of us who underwrote the $9 billion failed construction project by the now-defunct SCE&G and its state-owned partner Santee Cooper will never be made whole[.]" *What Others Say: SC On Track for Marriage of Cheaper, Greener*

9

*Electricity*, Index-J. (Sept. 28, 2021), https://www.indexjournal.com/opinion/editorials/what-others-say-sc-on-track-for-marriage-of-cheaper-greener-electricity/article_94ac7632-aa7f-5f0c-a30c-3e5579571522.html.

- "It was only a few short years ago that our state awoke to the V.C. Summer nuclear plant scandal. Billions of our tax dollars were wasted on two giant holes in the ground in Fairfield County." Mark Smith, *South Carolina is a Leader in Renewable Energy Solutions*, The Daniel Island News (Sept. 29, 2021, 9:16 AM), http://www.thedanielislandnews.com/opinions/south-carolina-leader-renewable-energy-solutions.

More recently, the press has extensively covered the guilty pleas of SCANA senior executives. Much of this reporting has blindly accepted the government's allegations as true and reflexively assumed wide-ranging illegality at the Project well beyond the scope of the guilty pleas entered by the SCANA executives:

- "Due to this fraud, an $11 billion nuclear ghost town, paid for by SCANA investors and customers, now sits vacant in Jenkinsville, S.C." Patrick Phillips, *Ex-CEO who Oversaw Doomed Nuclear Power Project Sentenced*, WBTV (Oct. 7, 2021, 6:36 AM), https://www.wbtv.com/2021/10/07/ex-ceo-who-oversaw-doomed-nuclear-project-sentenced/ (quoting press release of acting U.S. Attorney M. Rhett DeHart); Jason Raven, *Former SCANA CEO Sentenced for Role in VC Summer Nuclear Debacle*, Fox 46 Charlotte (Oct. 7, 2021, 9:23 PM), https://www.fox46.com/news/u-s/south-carolina/former-scana-ceo-sentenced-for-role-in-vc-summer-nuclear-debacle/ (same); Melinda Waldrop, *Former SCANA CEO Sentenced to 2 Years in Federal Prison*, Columbia Business Report (Oct. 7, 2021) (same); Conor Hughes, *Ex-SCANA CEO Sentenced to 2 Years on State Charges, Concurrent with Federal Time*, Greenville Post and Courier (Oct. 11, 2021) (same); Erika Williams, *Judge Signs Off on 2-Year Sentence for Ex-CEO Behind Failed Nuclear Facility*, Courthouse News (Oct. 11, 2021), https://www.courthousenews.com/judge-signs-off-on-2-year-sentence-for-ex-ceo-behind-failed-nuclear-facility (same).

- "Marsh, 66, owned up to his guilt in the nuclear debacle that cost 725,000 SC Electric & Gas ratepayers more than $2 billion after SC Public Service Commissioners gave SCANA-owned SCE&G up to 10 rate increases…Evidence showed that Marsh intentionally defrauded ratepayers and lied to state regulators while mismanaging the twin nuclear reactor construction." Jerry Bellune, *Nuclear Scammer Slapped with $200,000*

*Fine*, Lexington Cty. Chron. (Oct. 7, 2021, 5:16 PM), https://www.lexingtonchronicle.com/news/nuclear-scammer-slapped-200000-fine

- "While Marsh lied about the lack of progress in the final years of construction of the reactors, Westinghouse knew of the problem long before and didn't tell Marsh or other SCANA executives, U.S. Assistant Attorney Brook Andrews said at Marsh's sentencing Thursday in federal court." Jeffrey Collins, *1 More Judge Must OK 2-Year Sentence in Doomed Nuke Project*, ABC News (Oct. 11, 2021, 1:00 AM), https://abcnews.go.com/Technology/wireStory/judge-year-sentence-doomed-nuke-project-80513010.

- "While Marsh may not have intentionally tried to hide the project's failures at first . . . his lies slowly began to pile up . . . . Unfortunately, Marsh's and other executive's actions resulted in South Carolinians bearing the financial brunt of the failed Summer Nuclear Station." Erika Williams, *Judge Signs Off on 2-Year Sentence for Ex-CEO Behind Failed Nuclear Facility*, Courthouse News (Oct. 11, 2021), https://www.courthousenews.com/judge-signs-off-on-2-year-sentence-for-ex-ceo-behind-failed-nuclear-facility (quoting prosecution and FBI special agent, respectively).

Moreover, the press coverage has gone beyond neutral factual reporting and has persistently denigrated and condemned the motivations of the companies and individuals who worked on the Project. A decade's worth of such persistent and denunciative press predominantly concentrated in the Columbia capital region has no doubt influenced the perceptions of even those South Carolinians who were not direct victims of Mr. Benjamin's alleged fraud.

## **ARGUMENT**

Because the government explicitly alleges that the majority of South Carolinians who will comprise the jury pool here were personally victimized by Mr. Benjamin's alleged fraud, any panel drawn from the Columbia Division's jury area would be presumptively prejudiced against Mr. Benjamin, in violation of his Sixth Amendment right to a fair trial before an unbiased

11

jury.  Further, because extensive accusatory pretrial publicity has further prejudiced jurors in the Columbia Division who lack a direct financial stake in the Project, even a theoretical jury pool that is not predominantly composed of Mr. Benjamin's purported victims is likely to be heavily biased against him.  Additional safeguards are therefore necessary to ensure Mr. Benjamin receives a fair trial before an unbiased jury.

An alleged victim of the charged crime or someone with a direct financial stake in the allegations cannot serve as a juror.  Likewise, no one can serve as a juror who is a relative, friend, neighbor, or coworker of a victim of the alleged crime.  The overwhelming prevalence of alleged victims in the jury pool and the persistent, recriminatory press regarding the Project and Westinghouse's work on it will make it nearly impossible to identify an unbiased jury during *voir dire*. Any guilty verdict returned by such a biased jury would be highly susceptible to a successful challenge on appeal. The only efficient and fair way to safeguard Mr. Benjamin's Constitutional rights and avoid a cumbersome and likely fruitless *voir dire* process is to transfer this to another division in this District, such as the Greenville Division, where a jury could be drawn from a population with no direct stake in the alleged frauds and with far less exposure to years of prejudicing press accounts.

## I.    Legal Standards

The Sixth Amendment guarantees a criminal defendant "the right to an impartial jury," and the Fifth Amendment Due Process clause further safeguards this right by requiring fundamental fairness in federal criminal proceedings.  *See Skilling v. United States*, 561 U.S. 358, 378 (2010).  Accordingly, "[a]s a matter of law, the trial court is to exclude veniremen who cannot be impartial," and "'a juror is impartial only if he can lay aside his opinion and render a

12

verdict based on the evidence presented in court.'"  *United States v. Turner*, 389 F.3d 111, 117

(4th Cir. 2004) (quoting *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984)).

    The Court must presume juror bias where "the relationship between a prospective juror

and some aspect of the litigation is such that it is highly unlikely that the average person could

remain impartial in his deliberations under the circumstances."  *Person v. Miller*, 854 F.2d 656,

664 (4th Cir. 1988); *see also Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989)

(explaining that juror bias can be presumed where "circumstances . . . show a clear likelihood of

prejudice").  As Justice O'Connor explained in *Smith v. Phillips*, examples of such implied bias

include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror

is a close relative of one of the participants in the trial or the criminal transaction, or that the

juror was a witness or somehow involved in the criminal transaction."  455 U.S. 209, 221–24

(1982) (O'Connor, J., concurring).  Subsequent court rulings have automatically presumed bias

when direct victims of the charged crime and their close family and friends are members of the

jury pool.  *See, e.g.*, *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002) ("Automatically

presumed bias deals mainly with jurors who are related to the parties *or who were victims of the

alleged crime itself*.") (emphasis added).  Courts have also held that prospective jurors must be

excused for implied bias where they are shareholders in a company that is a party to a lawsuit,

*Turner*, 389 F.3d at 116, or otherwise have "a financial interest in the trial's outcome," *Poynter*,

874 F.2d at 222.  The Court can also find presumed jury bias—even before *voir dire*—where

pretrial publicity or community prejudice "will prevent a fair trial—a 'basic requirement of due

process.'"  *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

    Federal Rule of Criminal Procedure 18 allows for intra-district transfers of venue in

mandatory terms and provides that the "[t]he court must set the place of trial within the district

with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."  Fed. R. Crim. P. 18.  Federal Rule of Criminal Procedure 21 addresses transfers of venue for prejudice or convenience, and requires the Court to transfer venue when "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Fed. R. Crim. P. 21(a). Rule 21 also gives this Court discretion to "transfer the proceeding . . . to another district . . . in the interest of justice."  Fed. R. Crim. P. 21(b).  When considering an intra-district transfer under Rule 18, courts apply the same standards for assessing prejudice and convenience as those applied to inter-district transfer under Rule 21. *See, e.g.*, *United States v. Mosby*, No. 22-CR-00007-LKG, 2023 WL 220130, at *4 (D. Md. Jan. 17, 2023); *United States v. Lentz*, 352 F. Supp. 2d 718, 721 n.5 (E.D. Va. 2005); *see also* Fed. R. Crim. P. 18 advisory committee's note to 1966 amendments ("If the court is satisfied that there exists in the place fixed for trial prejudice against the defendant so great as to render the trial unfair, the court may, of course, fix another place of trial within the district (if there be such) where such prejudice does not exist.").  To determine whether a transfer of venue is appropriate, the Court should consider: "the (1) location of the defendant; (2) location of witnesses; (3) location of events likely to be in issue; (4) location of documents and records; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of trial; (9) docket conditions in each district; and (10) **any other specific element which might affect the transfer.**"  *United States v. Farkas*, 474 Fed. App'x 349, 353 (4th Cir. 2012) (citing *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243–44 (1964)) (emphasis added).  "No one of these factors is dispositive and 'it remains for the court to try to strike a balance and determine which factors are of greatest importance.'" *Id.* (quoting *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)).

14

Even under circumstances that would not reach the level of inherent prejudice that would mandate a transfer under Rule 18 or Rule 21, the Court maintains broad discretion to transfer venue for convenience when the interests of justice would be best served by trying the case in another venue). *See United States v. Broussard*, No. 3:16-CR-352, 2020 U.S. Dist. LEXIS 119843, at *8–9 (M.D. Pa. July 8, 2020) ("[T]he defendant is not required to show 'truly compelling circumstances for . . . change . . . [of venue, but rather that] all relevant things considered, the case would be better off transferred to another district.'" (quoting *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001)).

## II.    The Court Should Transfer Venue to Ensure That The Jury is Not Drawn From a Pool Overwhelmingly Made Up of Mr. Benjamin's Alleged Victims.

In very explicit terms, the government chose to allege that a majority of the individuals in the jury pool—SCANA and Santee Cooper ratepayers, investors, bondholders, and employees— are direct victims of the alleged conspiracy. Victims of the charged crime and their relatives cannot serve on a jury because it is implausible that the average person in their position could remain impartial in his deliberations. *See, e.g.*, *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002) (citing *Torres*, 128 F.3d at 45) (explaining that implied bias is found in "jurors who are related to the parties or who were victims of the alleged crime itself."). At trial, the government will emphasize that these individuals are victims and appeal to their personal interest in the outcome and sense of outrage about the failure of the V.C. Summer project. Indeed, press coverage about Mr. Benjamin's trial has acknowledged that the jury pool will be inherently biased because "[t]he jury selection will be from those ripped off by the failed nuclear construction project and who are still paying for it on their monthly electric bills." Jerry Bellune, *Accused Executive Gambles on Court Trial*, Lexington Cty. Chron. (Sept. 22, 2021, 3:32 PM),

15

https://www.lexingtonchronicle.com/news/accused-executive-gambles-court-trial.  Even the South Carolina Attorney General's Office has acknowledged the widespread bias that permeates matters related to the V.C. Summer Project and the difficulty even experienced attorneys, including a state prosecutor, face in judging the facts surrounding the Project objectively, declaring during the sentencing of Kevin Marsh in the South Carolina 7th Judicial Circuit that "when I [the prosecutor] first got involved with [Marsh's case] in the wake of what had happened, I probably had a pitchfork and torch in my hand just like everybody else did." Transcript of Sentencing Proceedings, *State v. Kevin Marsh*, Case No. 2020-GS-47-22 (S.C. 7th Jud. Cir., Oct. 11, 2020) (Attached as Exhibit 1).  Where, as here, the government alleges that potential jurors are themselves victims of the charged crime, there is no need for the Court to go through cumbersome individual *voir dire* to find actual bias—the Court must presume the potential juror's inherent bias against the defendant.  *Torres*, 128 F.3d at 45.

Further, even if some ratepayers, investors, or bondholders could theoretically set aside their own feelings regarding Mr. Benjamin and the V.C. Summer project, the Fourth Circuit has made clear that such ratepayers and investors are prohibited from serving as jurors if they have a financial interest in the trial's outcome.  *See, e.g., Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1050–51 (4th Cir.1984) (holding stockholder in corporation which is party to lawsuit is incompetent to serve on jury); *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 971–72 (4th Cir.1971) (same); *see also Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989) (discussing how a juror with "a financial interest in the trial's outcome" may be subject to *per se* disqualification because such an interest "shows a clear likelihood of prejudice.").  This is precisely the case here; if Mr. Benjamin is convicted, any monetary restitution imposed at sentencing would likely be used to provide relief for ratepayers and investors harmed as a result

16

of the Project's failure.[4]  Indeed, the indictment specifically seeks forfeiture from Mr. Benjamin

of funds he received in connection with the V.C. Summer project.  Any ratepayer, bondholder, or

investor in SCANA or Santee Cooper must therefore be disqualified from the jury pool as *per se*

prejudiced, given their financial interest in any potential restitution that might be ordered if Mr.

Benjamin were to be convicted.

Mr. Benjamin's Sixth Amendment right to a fair trial and right to an impartial jury

prohibits SCANA and Santee Cooper ratepayers, investors, bondholders, and employees from

serving as jurors here.  Therefore, a significant proportion of the Columbia Division's jury pool

will be ineligible to serve on the jury due to their implied bias, even before considering how

many of the remaining potential jurors have relatives, friends, neighbors, or coworkers who are

alleged victims of Mr. Benjamin's fraud.  Venue transfer is appropriate and necessary here

because so much of the jury pool is biased.  *See, e.g.*, *United States v. Sablan*, No. 1:08-CR-

00259-PMP, 2014 U.S. Dist. LEXIS 175682, at *6 (E.D. Cal. Dec. 19, 2014) (transferring venue

where the evidence showed that 60% of the venire was biased against the defendant). Indeed, the

implied bias of alleged victims cannot be solved through *voir dire*—it requires that such alleged

victims be automatically disqualified from serving on the jury.  *See United States v. Haynes*, 398

F.2d 980, 984 (2d Cir. 1968) ("In determining whether a prospective juror should be excluded

[for implied bias] his statements upon voir dire are totally irrelevant; a person 'may declare that

---

[4] Indeed, plea agreements entered by SCANA executives Kevin Marsh and Stephen Byrne involve substantial monetary restitution to ratepayers, and the government is certain to pursue similar restitution against Mr. Benjamin.  *See* Plea Agreement, *United States v. Kevin Marsh*, Case No. 3:20-cr-727, Dkt. No. 2 at ¶ 3 (D. S.C., Nov. 24, 2020); Plea Agreement, *United States v. Stephen Andrew Byrne*, Case No. 3:20 -cr-335, Dkt. No. 4 at ¶ 2 (discussing restitution to be paid by Marsh and Byrne to ratepayers and restitution to ratepayers paid by Dominion Energy as part of its agreement to acquire SCANA).

he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice.'") (quoting *United States v. Burr*, 25 F. Cas. 49, 50 (C.C.D. Va. 1807) (Marshall, C.J.)). The same is true of shareholders who have a financial interest in the outcome of the trial. *See Chestnut v. Ford Motor Co.*, 445 F.2d 967, 971 (4th Cir. 1971) ("That a stockholder in a company which is a party to a lawsuit is incompetent to sit as juror is so well settled as to be black letter law.*"*).

Transfer to the Greenville Division of this District is therefore required to ensure a Constitutionally acceptable, unbiased jury pool.

## III.    The Pejorative Press Coverage of the V.C. Summer Project Has Presumptively Prejudiced Even Those Potential Jurors With No Direct Financial Interest in the Project and the Sixth Amendment and Rule 18 Therefore Require Transfer.

Even if it were feasible to identify and exclude alleged direct victims and their family, friends, neighbors, and coworkers from the jury pool, it is highly likely that the remaining potential jurors would still be prejudiced against Mr. Benjamin due to the constant adverse publicity that has plagued the V.C. Summer project since its inception. While "juror impartiality . . . does not require ignorance," the Court can presume prejudice where potential jurors have been exposed to an onslaught of articles containing "vivid, unforgettable information," inflammatory language, and "evidence of the smoking-gun variety [that] invite[s] prejudgment of [the defendant's] culpability." *Skilling* at 380, 382–83; *United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019). Here, the media coverage has done nothing but invite prejudgment of Mr. Benjamin's culpability by baselessly painting the Project as doomed from the beginning and conflating Mr. Benjamin and Westinghouse's role on the Project with that of SCANA executives who have already pleaded guilty.

18

The South Carolina press, concentrated in the Columbia capital region, has irresponsibly described the V.C. Summer Project as "doomed,"[5] "a failure by every party involved,"[6] a product of corporate greed,[7] and a "fraud."[8] This press coverage goes beyond reporting the facts of the Project's failure and instead groundlessly paints the Project broadly as a criminal enterprise, accusing Westinghouse of taking "potentially criminal shortcut[s]"[9] and uncritically reporting comments from South Carolina public officials who portrayed the Project as a

[5] *Long-secret report details 'significant' problems at failed nuclear reactor project*, THE STATE (Sept. 4, 2017), https://www.thestate.com/news/local/article171238277.html#:~:text=The%20doomed%20V.C.%20Summer%20nuclear%20project%20suffered%20from,released%20Monday%20by%20S.C.%20Gov.%20Henry%20McMaster%E2%80%99s%20office ("The doomed V.C. Summer nuclear project suffered from flawed construction plans, faulty designs, inadequate management of contractors, low worker morale and high turnover[.]").

[6] *Sen. Sean Bennett to help investigate failure of nuclear facility*, POST AND COURIER (Aug. 16, 2017), https://www.postandcourier.com/berkeley-independent/news/sen-sean-bennett-to-help-investigate-failure-of-nuclear-facility/article_77977d0b-82d2-5698-917e-c09ca5acca9c.html ("The V.C. Summer nuclear project is an example of a failure by every party involved").

[7] Andrew Brown & Thad Moore, *Top SCANA accountant accused executives of mismanaging S.C. nuclear plant to prop up earnings*, POST AND COURIER (March 29, 2018), https://www.postandcourier.com/business/top-scana-accountant-accused-executives-of-mismanaging-s-c-nuclear-plant-to-prop-up-earnings/article_743584d4-3295-11e8-8465-47a2cc905671.html#:~:text=In%20the%20voicemail%20obtained%20by%20The%20Post%20and,company%E2%80%99s%20profits%20and%20lock%20down%20their%20executive%20bonuses ("There were executives driven by dollar signs. That is what it shows. That's what we thought from day one, and now we are getting evidence to prove it . . . .  It's beyond misconduct. This is criminal activity.").

[8] Jason Raven, *Former SCANA CEO Sentenced for Role in VC Summer Nuclear Debacle*, FOX 46 CHARLOTTE (Oct. 7, 2021, 9:23 PM), https://www.fox46.com/news/u-s/south-carolina/former-scana-ceo-sentenced-for-role-in-vc-summer-nuclear-debacle/ (quoting U.S. Attorney's Office: "Due to this fraud, an $11 billion ghost town, paid for by SCANA investors and customers, now sits vacant in Jenkinsville, South Carolina.").

[9] Andrew Brown, *Stamped for Failure: Westinghouse and SCANA used unlicensed workers to design abandoned S.C. nuclear reactors*, POST AND COURIER (Sept. 24, 2017), https://www.postandcourier.com/business/stamped-for-failure-westinghouse-and-scana-used-unlicensed-workers-to-design-abandoned-s-c-nuclear/article_3ea2046a-9d39-11e7-a186-cb396c86b8b9.html.

"'criminal fraud through the concealment of material information.'"[10]  Press coverage has gone

so far as to portray the Project's failure as "a cover up" with "deception at its core" and

reported—long before any charges or guilty pleas were even announced—that the Project's

leaders "lied to everyone and . . . did it intentionally."[11]  This press coverage, which has been

ongoing for the life of the Project, erroneously and without substantiation suggests that the

Project was, in fact, a fraud perpetrated with criminal intent by all involved.  And this press

coverage does not limit its accusations to the individual SCANA executives who have pleaded

guilty—the South Carolina press has continuously and improperly grouped Westinghouse and

SCANA together in reporting generalized accusations of criminality as if they were proven facts.

This coverage leaves readers with the impression that Mr. Benjamin, as an executive at

Westinghouse overseeing the Project, was necessarily involved in a criminal enterprise merely

by association with the Project.  The media has exacerbated this false narrative by blindly

repeating the government's unproven allegations and legal conclusions as settled fact.[12]

---

[10] Andrew Brown, Jamie Lovegrove, *Companies building failed S.C. nuclear project 'were looking to cut corners' as state's top cops asked to investigate*, POST AND COURIER (Sep. 25, 2017), https://www.postandcourier.com/politics/companies-building-failed-s-c-nuclear-project-were-looking-to-cut-corners-as-state-s/article_7f4a7f72-a1fa-11e7-9ba1-cf4fa5d1ece9.html ("House leaders wrote they have come to believe the collapse of the project 'is a direct result of misrepresentation by SCANA and SCE&G,' as well as possible 'criminal fraud through the concealment of material information.'").

[11] Andrew Brown, Thad Moore, *Insight that would've alerted problems with nuclear project scrubbed from audit two years ago*, POST AND COURIER (Nov. 22, 2017), https://www.postandcourier.com/business/insight-that-wouldve-alerted-problems-with-nuclear-project-scrubbed-from-audit-two-years-ago/article_691272a4-cf0f-11e7-a289-bf59c8d8d969.html ("This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally.").

[12] *See, e.g.*, Erika Williams, *Judge Signs Off on 2-Year Sentence for Ex-CEO Behind Failed Nuclear Facility*, COURTHOUSE NEWS (Oct. 11, 2021), https://www.courthousenews.com/judge-signs-off-on-2-year-sentence-for-ex-ceo-behind-failed-nuclear-facility (quoting FBI agent Susan Ferensic as saying, "Unfortunately, Marsh's and other executive's actions resulted in South

This deluge of inflammatory press coverage, which largely promotes the existence of a fraud conspiracy and Westinghouse's participation in such a conspiracy, will inevitably cause potential jurors to pre-judge important issues on which the government bears the burden of proof at trial.  This is the very press coverage that "invite[s] prejudgment of [the defendant's] culpability" and will confuse or bias potential jurors. *Skilling* at 380, 382–83.  The broad-brush manner in which the South Carolina press has painted the entire Project as a criminal enterprise will also cause juror confusion and pre-judgement as to which parties may have actually been responsible for the Project's failure and the resulting financial harm to ratepayers.

The inescapable result of this steady drumbeat of unfounded and harshly accusatory press coverage in the capital region is that any jury drawn from the jury pool in this division will likely prejudge Mr. Benjamin's guilt based merely on his association with the Project and interactions with SCANA executives who have already pleaded guilty to fraud.  Such negative press coverage, however, will have an even greater effect on the individuals who make up the Columbia Division's jury pool given their unique local interest in the Project.  Indeed, the county in which the Project was located—Fairfield County—feeds directly into this Division's venire, and it is highly likely that individuals in Fairfield County and neighboring counties are keenly attuned to reporting regarding the abandoned nuclear power plant project in their backyard.  Furthermore, given these potential jurors' proximity to the state's capital and federal courthouse

_____

Carolinians bearing the financial brunt of the failed Summer Nuclear Station" and acting US Attorney Rhett DeHart as saying, "Due to this fraud, an $11 billion nuclear ghost town, paid for by SCANA investors and customers, now sits vacant in Jenkinsville, SC.");  *Records: Ex-CEO won't face charges in nuclear fraud case*, Faribault Cty. Reg. (Dec. 22, 2021), https://www.faribaultcountyregister.com/wire/?category=5050&ID=153040 ("Roderick gave the FBI incriminating information about Benjamin in two interviews earlier this year, prosecutors said in court filings. Roderick said Benjamin lied to him about the project schedule and had created a "culture of fear" with an "unbearable" management style.").

where two SCANA executives pleaded guilty to wrongdoing in connection with the Project, it is

unlikely that the Court will be able to convene a jury of twelve individuals in this Division who

have not been subjected to—and are likely to come in with preconceived opinions shaped by—

the constant coverage of these other criminal proceedings over the years.  Mr. Benjamin is

innocent until proven guilty, and he is entitled to a trial where the press coverage has not

extensively and irreparably infected the entire jury pool with groundless pre-judged conclusions

or criminality and fraud.

      The disparaging press coverage is likely to continue, or even worsen, as Mr. Benjamin's

trial date approaches.  Because of the volume, content, and ongoing nature of this prejudicial

press coverage, even if a jury pool excludes individuals with a direct financial stake in the trial—

ratepayers, investors, and bondholders—it is highly likely to be biased against Mr. Benjamin by

years of negative press coverage.  Therefore, the Court should grant a transfer of venue under

Rule 18.

**IV.     Alternatively, the Court Should Exercise Its Discretion to Transfer the Proceedings in the Interest of Justice.**

      As discussed above, the high proportion of individuals in the jury pool who are alleged to

be direct victims of the charged crime and the pervasive negative press coverage make any jury

convened in this judicial division presumptively prejudiced against Mr. Benjamin.  But the Court

may transfer this case even without a finding of presumptive prejudice.  Even if the Court finds

that an unbiased jury could theoretically be empaneled in this division, the amount and depth of

*voir dire* procedures required to identify the few impartial persons located in the Columbia

Division would be so burdensome as to justify transfer in the name of judicial efficiency and in

the interest of justice.

22

The high proportion of direct victims in the jury pool will require an onerous, individualized *voir dire* process that could extend Mr. Benjamin's trial by weeks. First, efforts would need to be made to identify all SCANA and Santee Cooper ratepayers and investors in the jury pool and systematically exclude them from this matter as alleged victims of the alleged fraud. Second, the Court would need to conduct a detailed, individualized *voir dire* to assess the level of prejudice held by all remaining persons in the jury pool based on the amount of negative press coverage and their personal connections to SCANA and Santee Cooper ratepayers, investors, bondholders, and employees. The vast amount of adverse media coverage the people making up this venire have been exposed to over the past decade will also make this process time-consuming and potentially unsuccessful, requiring significant delay and additional work if an impartial jury cannot be identified during *voir dire*.

While it may be theoretically possible for the Court to identify twelve impartial jurors in this judicial division with very substantial time and effort, it would be far preferable to avoid this burden and delay by transferring venue now to avoid a cumbersome and likely fruitless *voir dire*. The alternative would be a long *voir dire* in which the Court will need to question prospective juror with regard to his or her connections to the Project, even after taking the time to screen out former SCANA and Santee Cooper ratepayers or their family members. Transfer of venue now will promote judicial efficiency because the need for such a time-consuming voir dire process will be lessened if venue is transferred to the Greenville Division.

## **CONCLUSION**

For all these reasons, Mr. Benjamin asks the Court to transfer the proceedings to the

Greenville Division within the District of South Carolina.

Respectfully submitted,

Date:  February 8, 2023

/s/Andrew B. Moorman, Sr.
MOORMAN LAW FIRM, LLC
416 East North Street 2nd Floor
Greenville, South Carolina 29601
864-775-5800
andy@andymoormanlaw.com
Federal ID # 10013

William M. Sullivan, Jr.
Thomas C. Hill
Patrick Hovakimian
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Phone: 202-663-8027
wsullivan@pillsburylaw.com
thomas.hill@pillsburylaw.com
patrick.hovakimian@pillsburylaw.com
*Admitted Pro Hac Vice*

*Counsel for Defendant Jeffrey Benjamin*

24