1

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
 2                       COLUMBIA DIVISION

 3   _____
                                        )
 4   UNITED STATES OF AMERICA,          )
                                        )
 5         Plaintiff,                   )  Docket No. 3:21-cr-00525
                                        )
 6         vs.                          )  Columbia, SC
                                        )
 7                                      )
     JEFFREY ALAN BENJAMIN,             )
 8                                      )
           Defendant.                   )
 9   _____)  DATE:  February 22, 2023

10
                  BEFORE THE HONORABLE MARY GEIGER LEWIS
11               UNITED STATES DISTRICT JUDGE, PRESIDING
                           MOTION HEARING
12

13   A P P E A R A N C E S :

14   For the Plaintiff:

15   BROOK BOWERS ANDREWS and WINSTON D. HOLLIDAY
     U.S. Attorney's Office
16   1441 Main Street, Suite 500
     Columbia, SC 29201
17   803-929-3056
     brook.andrews@usdoj.gov
18
     WILLIAM EDWARD SCHURMANN
19   Department of Justice
     Criminal Division - Fraud Section
20   1400 New York Avenue NW
     Washington, DC 20001
21   202-616-0829
     william.schurmann2@usdoj.gov
22


23
     COURT REPORTER:              KAREN V. ANDERSEN, RMR, CRR
24                                United States Court Reporter
                                  901 Richland Street
25                                Columbia, SC  29201
```

A P P E A R A N C E S:

For the Defendant:

WILLIAM MICHAEL SULLIVAN, JR and PATRICK HOVAKIMIAN
Pillsbury Winthrop Shaw Pittman, LLP
1200 Seventeenth Street NW
Washington, DC 20036
202-663-8280
william.sullivan@pillsburylaw.com
patrick.hovakimian@pillsburylaw.com


ANDREW BURKE MOORMAN
Moorman Law Firm, LLC
416 East North Street
Greenville, SC 29601
864-775-5800
andy@andymoormanlaw.com

1           THE COURT:  Okay.  First of all, let me see who all

2     I've got here today.  I see I have Mr. Andrews for the

3     Government.  Where is Ms. Limehouse?  Is she coming?

4           MR. ANDREWS:  She's not here today, Judge.

5           THE COURT:  Oh, okay.  Tell her hello for me.

6           MR. ANDREWS:  Absolutely.

7           THE COURT:  For Mr. Benjamin, I have --

8           MR. SULLIVAN:  Bill Sullivan, Your Honor.

9           THE COURT:  Bill Sullivan.  Okay.

10          MR. HOVAKIMIAN:  Patrick Hovakimian, Your Honor.

11          THE COURT:  Okay.  I know we have several matters

12    that we need to get to.  I have one matter, I guess, under

13    advisement that related to the grand jury materials and some

14    notes of the agent.  And I've read the grand jury testimony.

15    And there is no mention of any deception by Mr. Benjamin or

16    anything remotely related to that in those grand jury

17    materials.  So unless the agent testifies or some other

18    reason why the defense would be entitled to that, I don't

19    think that would be something that needs to happen right now.

20          I also looked at the agent's notes.  And I will

21    confess that they are illegible.  I mean, I thought that I

22    had seen over the years with some of my law partners the

23    worst handwriting ever.  But this is unbelievable.  Okay?

24    But we did go through, and where it was possible to figure

25    out what the agent was writing -- again, there was no -- none

1    of the information that you were concerned about being there.

2    So as far as that motion is concerned, I'm going to deny that

3    motion.  If at some point those materials become something

4    the Government needs to disclose, I'm sure they will do that.

5    Is that what you understand?

6        MR. ANDREWS:  Thank you, Judge.  Yes.

7        THE COURT:  Okay.  All right.  Very good.  All

8    right.  Now that leaves for us --

9        MR. SULLIVAN:  If I might, Your Honor.  Thank you

10   very much for taking the time to review those materials.

11       THE COURT:  Really, I wish I could show you the

12   agent's notes, because I want you to believe just how

13   illegible they are.

14       MR. SULLIVAN:  I completely believe the Court.  I

15   just want to make sure that my understanding is clear for the

16   record.  So despite the fact that the 302 makes

17   representations that Mr. Roderick believed Mr. Benjamin lied

18   or deceived him, which was heavily contested by Mr. Ellerman,

19   counsel for Mr. Roderick, and disputed by Mr. Roderick's own

20   declaration, the representations in the grand jury are

21   consistent with Mr. Roderick's declaration, consistent with

22   Mr. Ellerman's representations, and inconsistent with the

23   302.

24       THE COURT:  Well, what I'm telling you is, all I

25   know, he may have information from another source that would

1  allow him to put that in the 302s.  But I'm telling you, in

2  the grand jury testimony and the notes, I did not see

3  anything that related one way or another to that.

4       MR. SULLIVAN:  Thank you, Judge.  I appreciate you

5  taking the time again.

6       THE COURT:  Okay.  All right.  Now that leaves, I

7  believe, the defendant's motion that's at Docket 105 to

8  compel *Brady* disclosure.  And I have read your materials on

9  that, but I would be happy to listen to anything else you

10  want to tell me.

11       MR. SULLIVAN:  Thanks very much, Your Honor.  And I,

12  again, appreciate you taking the time to read our materials,

13  I think we can distill and crystallize the issue as reflected

14  in our reply.  All we are looking for here is disclosure of

15  the information that the Government has already determined to

16  be *Brady* in that it is favorable, exculpatory, or material to

17  the defense with regard to the substantive issues,

18  impeachment, sentencing, or punishment.

19       We believe the Government has already ascertained

20  those documents.  And there's nothing in the Fourth Circuit

21  to preclude the disclosure of those documents to the defense.

22  As a matter of fact, in many circuits, it's absolutely

23  mandated.  The court in *Skilling* said that the Government

24  must disclose.  The court in *Skilling* said the Government

25  cannot hide these types of materials in huge document

productions.  We have a huge document production.  We have 16

million documents.

The *Blankenship* court, a Fourth Circuit Court, not

the Fourth Circuit, but a court in this jurisdiction, a

parallel court to your own court, has mandated that the

Government scrutinize its materials and disclose.  And that

court even went so far as to say the Government is in the

best position to decide what's exculpatory while they

concurrently include material to decide which is inculpatory

as they build their case.

So we believe there's nothing precluding you from

simply saying to the Government, whatever you found that's

*Brady*, give it to them.  It would be economical.  It would be

efficient.  And it would be consistent with the rules

outlined in *Brady* and the Justice Department manuals.

Now, the Government has cited *Yi* and *Sotomayor*.

Those cases are inapposite.  *Yi* is a post-conviction case

whereby the Court declined the relief sought by the

defendant, who was asking for post-conviction de novo review

of the Government's materials in a search for *Brady*.  We are

not asking for that here.

And in *Sotomayor*, even though the remedy was denied,

the relief was denied there, that's a very different case.

That case featured less than 10 percent of the documents

issued here, Your Honor.  But also, in *Sotomayor*, there was

1    an index.  There was particularized documents.  There were

2    catalogs of materials.  There was an avenue and an

3    opportunity for the defendant to search.  We don't have that.

4    We have 16 million documents.  We don't have an index.  We

5    don't have particularized catalogs.  We don't have

6    delineations of categories of documents, nor do we have

7    metadata.  We have no metadata for the materials we've

8    obtained for the Government relating to Fluor, which, as you

9    know, is a subcontractor here which was obligated to build

10   the project and which got involved in serious contentions or

11   consciousness between WEC and Fluor in terms of progress,

12   rebaselining and scheduling.

13           You've seen our motion to dismiss.  We've outlined

14   our theories of defense and how separate Mr. Benjamin is from

15   what went on at SCANA with regard to representations made to

16   investors, bondholders, and rateholders, which implicates our

17   venue motion, which will come next.

18           Those cases demonstrate that what we are asking for

19   is well-documented, well-established throughout the country.

20   There's an obligation to provide *Brady*.  There's an

21   obligation to search for *Brady*.  And that we believe was done

22   here.  But there is a further --

23           THE COURT:  When you say an obligation to search for

24   *Brady*, so, basically, you are saying that of these 16 million

25   documents, you want the Government to go through all 16

1   million documents and tell you the documents they think might

2   be helpful to Mr. Benjamin?

3           MR. SULLIVAN:  That's not what we are asking.

4           THE COURT:  I hope not.

5           MR. SULLIVAN:  What we are asking, as outlined in

6   *Skilling* and *Blankenship*, is that the United States should

7   specifically designate those documents that is already --

8           THE COURT:  Already aware of.

9           MR. SULLIVAN:  -- already aware of to be *Brady* in

10  light of the definitions of *Brady* I just gave.  And I would

11  also further refine that by saying, I think the Court would

12  agree with me the case law does distinguish between

13  disclosure and production.

14          THE COURT:  Yes.

15          MR. SULLIVAN:  Many of the cases outline how

16  *Skilling* in particular, and I just quoted that, a production

17  which includes *Brady* embedded like the needle in the hay

18  stack of 4 to 5 to 10 million documents and we had 16 --

19          THE COURT:  Look, I used to be a plaintiff's lawyer.

20  I'm very familiar with the giant dump of documents in which

21  you are supposed to find something.

22          MR. SULLIVAN:  That's good to hear.  And I

23  appreciate that, Your Honor.  That's all we are looking for,

24  disclosure of known *Brady* material.  And as we've

25  demonstrated in our record, we believe known *Brady* material

1    exists, has been found by the Government, is in their

2    possession, and as I said earlier, would represent no burden,

3    no hardship, no prejudice, to simply let the defense know.

4          THE COURT:  All right.  Thank you.  All right.

5          Mr. Andrews, that sounds reasonable.  If you already

6    know and you've identified *Brady* material, why wouldn't you

7    disclose that?

8          MR. ANDREWS:  Well, so, Judge, I think -- and I just

9    had this conversation with Mr. Sullivan.  But there seems to

10   be signals crossed on what the Government's position is on

11   identifying *Brady* material.  We have always told the defense,

12   look,we get it, it's a large volume of discovery.  We have

13   been over-inclusive in our approach to discovery.  And it's

14   not to frustrate the defendant, but, in fact, to give them an

15   ample case and to make sure that we are being overly careful

16   in our approach to disclosure.  As we have done that, we have

17   also indicated to the defendant everything that this case is

18   about.

19         There is a speaking indictment in this case with 63

20   paragraphs of factual arguments supporting our theory of the

21   case.  Before we ever charged Mr. Benjamin, we gave them a

22   reverse proffer in which we walked through hundreds of slides

23   in a PowerPoint deck making exactly clear upon what documents

24   and what testimony our case in chief was going to be based.

25         Now, we have not, in the course of our four years of

1    investigation in this case, found specific documents that we

2    believe to be exculpatory of Mr. Benjamin.  Now, is there

3    information in the discovery that the defendants may find to

4    be favorable to their case?  I'm sure that there is.  And I

5    have no doubt that with their team of attorneys, they will

6    find those documents and put them together in a manner that

7    they can present to the jury.  And that's exactly their job.

8    And it's exactly not our job.

9         I understand the representation he's making.  I

10   think they've distilled their case down to something perhaps

11   less than we understood it to be when it started.  I think

12   they understand that the law does not compel the Government

13   to go through all of those pages of discovery and identify

14   for them the exculpatory information.  All of that

15   information has been disclosed.  It is word searchable.

16        With respect to the Fluor production, I understand

17   they've sought a third-party subpoena for those documents.

18   We have as well.  There should be metadata in that

19   production.  I think that issue should be cured.  That's the

20   only notice that I'm aware of that they don't have what they

21   need to adequately mine the information we have produced in

22   this case to build a defense for their client.

23        Look, Judge, if we were going to talk about specific

24   documents and evidence, we are very aware of our obligations

25   under *Brady*.  And we are happy to have that conversation.

1    But we have no time represented to them that we have a box

2    marked *Brady* material in the office that we are hiding from

3    them or otherwise not identified and we are hoping that they

4    don't find in the discovery.

5         THE COURT:  We did get a box of documents one time

6    for a big defense firm that said, "Do not produce."  And the

7    case resolved shortly thereafter.

8         MR. ANDREWS:  I'm sure it did.

9         THE COURT:  It does happen.

10        MR. ANDREWS:  We don't have that box, Judge.  We

11   have given them everything we have, which is not an approach

12   that we are obligated to take.  I would say, we've given them

13   things that are not Rule 16, that are not *Brady*, *Giglio* or

14   Jencks, but, nevertheless, they were received by us in the

15   course of the grand jury investigation.  And we are handing

16   that over anyway.  And, again, that's not to overburden the

17   defendants, who do have the resources at their disposal to

18   review those documents and mine them and word search them on

19   the platforms they use for document review.  But it's rather

20   to make sure that we are being overly careful.  This is a

21   complex case.  We understand that.  There's a lot of

22   different potential avenues out there for the defense to

23   take.  But we have not frustrated them in any way.

24        If anything like that arises where we find documents

25   that we really believe are exculpatory, we don't have any

1  objection to identifying them.  We do contest --

2          THE COURT:  Well, I think that in the course of your

3  preparation, if you do identify documents that are

4  exculpatory, then that's when you do need to disclose those

5  to the defendant.

6          MR. ANDREWS:  That's right.  And just so we are

7  clear about disclosure, I think what we are talking about

8  identification, because the documents have already been

9  given.

10          THE COURT:  Everything's been disclosed.

11          MR. ANDREWS:  That's right, it's been disclosed,

12  it's been provided.  And we throw around the word *Brady* a

13  lot, but an element of *Brady* is suppression.  It necessarily

14  involves the withholding and the suppression of evidence.

15          And just to be clear, when *Skilling* articulated the

16  rule here, it said expressly not that *Brady* obligates the

17  specific identification of exculpatory information.  That is

18  the general rule that the court articulated in that case.  It

19  is in our brief.

20          So, Judge, look, we will continue to honor and

21  uphold our discovery obligations in this case.

22          THE COURT:  So what you are telling me is that you

23  haven't found anything that you truly believe to be

24  exculpatory?  So you haven't identified anything to the

25  defendants?

1          MR. ANDREWS:  We have disclosed everything and not

2    identified anything.

3          THE COURT:  Okay.  All right.

4          MR. ANDREWS:  That's correct.

5          THE COURT:  And what is your position about going

6    forward?  If you are continuing, during your preparation for

7    the trial, you determine that something is exculpatory, is it

8    your intention to identify that to the defendant?

9          MR. ANDREWS:  Judge, it would continue to be our

10   assertion that that is not legally obligated.  But we will

11   have those conversations.  If we see anything that is

12   alarming to us in the way that it stands out as

13   exculpatory -- here's the trap that I think we get into.

14   There is obviously subjectivity here about what the

15   defendants -- their defenses are going to be.  And we can't

16   anticipate all of those.  There are certainly going to be

17   documents --

18         THE COURT:  There is an element of good faith here.

19         MR. ANDREWS:  That's right.

20         THE COURT:  When you are going through those

21   documents, if you've at least thought, hmmm, this might be a

22   problem for us --

23         MR. ANDREWS:  Judge, let me identify a specific

24   example.  The defendants are well aware that we've had three

25   individuals from the V.C. Summer nuclear plant who have pled

1    guilty to felony offenses in this case.  Right?  Everybody

2    knows that.  Kevin Marsh, Steve Byrne, and Carl Churchman

3    have pled guilty to felonies.  Their plea agreements, Mr.

4    Marsh's sentencing proceeding, all of that is public.  The

5    defendants have it.  Their 302s, their memorandum where they

6    have conceded crimes, where they have conceded fault, all of

7    that has been disclosed to the defendant.  Obviously, you

8    know, those folks may all be, or some of them, on our witness

9    list at trial.  That is all available Giglio impeachment

10   evidence.  They know that.  And they are welcome to use it.

11   We don't have any opposition to that.  And we've had

12   conversations with them about those particular witnesses as

13   well.

14        Now, for the other, you know, 16 million pages of

15   documents that are out there, you know, we don't want to get

16   into a game of going through and saying --

17        THE COURT:  Well, I am not asking you to go through.

18   I'm saying in the course of going through the documents for

19   purposes of preparing your case -- not asking you to go

20   through and locate exculpatory information out of 16 million

21   documents.  But in the course of preparing your case, if you

22   do, in the course of that, discover something that you feel

23   is potentially exculpatory, what is your intention about

24   disclosing that?

25        MR. ANDREWS:  If we find something that is

1    potentially exculpatory, then we will have a conversation

2    with them about that.

3            THE COURT:  Okay.  So you say you will have a

4    conversation about that.  I don't know what that means.

5            MR. ANDREWS:  We will inform them of that particular

6    document.

7            THE COURT:  Okay.  All right.

8            MR. ANDREWS:  But I want to be clear, though, that

9    we do not intend to go through --

10            THE COURT:  And I don't expect you to.

11            MR. ANDREWS:  -- the rest and identify.

12            MR. SULLIVAN:  Your Honor, you have acutely hit it

13    on the head right now, right then.  Just before you said,

14    might be a problem.  That is a good way to identify our

15    perception of what *Brady* is in terms of favorability,

16    exculpatory nature, material to the defense.  In

17    conversations with the Government, which we have outlined in

18    our motion, we have learned that:  A, this case was too big

19    to do a *Brady* review; B, yes, we found stuff that are

20    inconsistent with our prosecution theory.  Yes, we found

21    stuff that we will have to deal with at trial.  That

22    dovetails precisely with your delineation of "might be a

23    problem."

24            And yet, today, they refused to admit that they have

25    such material after telling us that they do, which is totally

1   consistent with what you said in terms of describing such

2   material.  So I posit that they have such material.  They are

3   obligated to produce it today or in short form, because it

4   has been located, consistent with your delineation of what

5   *Brady* means.  And we agree with your assessment.

6           THE COURT:  All right.  Well, Mr. Sullivan, what you

7   are suggesting is that Mr. Andrews has information that he

8   thinks is exculpatory, particularly he can identify documents

9   that are exculpatory, and he's not giving those to you.  I

10  don't accept that.  I accept what the Government says, that

11  they understand what their obligations are under *Brady*.  They

12  know what they are supposed to do with documents that they

13  have identified as exculpatory to date.  They say none.

14          If in the course of preparing their case and

15  continuing to review these documents, as you will be doing as

16  well, if they come across something that they think is

17  exculpatory, they are going to have to turn it over.  And

18  they tell me that they will.  So I don't see what the problem

19  is here then.

20          MR. SULLIVAN:  My only concern, Your Honor, is that

21  their view of *Brady* is extremely limited and not consistent

22  with yours or mine.

23          THE COURT:  And they probably aren't.  But there's

24  no way for us to change that, really.  I mean, we have to

25  rely on their good faith.  They know what's a problem for

17

1    their case.  And I believe that all the lawyers here are

2    acting in good faith, and that if Mr. Andrews does come

3    across something that he knows he's going to really have to

4    deal with, he will identify that document for you.

5              MR. SULLIVAN:  Thank you, Your Honor.

6              THE COURT:  All right.

7              MR. HOLLIDAY:  Your Honor, if we could, I have to

8    take a half a step back.  At the very end of your discussion

9    regarding the grand jury material and Agent Hawkins notes and

10   all that stuff, Mr. Sullivan opined that does that mean, Your

11   Honor, that you are accepting the Ellerman/Roderick version

12   of how the interview took place?

13             THE COURT:  No, I am not.  That's not my job to do

14   that.  I looked at those materials to see if, in fact, there

15   was testimony that Mr. Sullivan suspected was there, and it

16   was not.

17             MR. HOLLIDAY:  Okay.  Thank you, Your Honor.  I

18   appreciate it.

19             THE COURT:  All right.  Okay.  I think that

20   leaves -- I'm sorry, Mr. Sullivan, something else you wanted

21   to say?

22             MR. SULLIVAN:  No, I was just leading on to the next

23   motion.

24             THE COURT:  All right.  The venue issue.  All right,

25   Mr. Sullivan.

1          MR. SULLIVAN:  As we outlined in our papers in terms

2     of what the exchange of pleadings has been on this issue, I

3     think it's fair to say that the Government, if not outright

4     conceding, understands our position with regard to the

5     ratepayer, bondholder, investor issue with regard to the

6     population of Columbia, which would be jury area B.

7     Sixty-five percent of those individuals were ratepayers.  We

8     are concerned that the Government has styled this case as a

9     case whereby SCANA representatives and Mr. Benjamin have

10    conspired to defraud these individuals, compelling them to

11    pay excess rates for their utilities because of that fraud.

12    Obviously, we contest that.  We don't believe the Government

13    has shown or can show a conspiracy between SCANA and Mr.

14    Benjamin, SCANA and Westinghouse, Mr. Benjamin and anyone at

15    Westinghouse.  But, nevertheless, those are the allegations,

16    Your Honor.

17         We are concerned that individuals who are going to

18    be listening every day to how they were victimized, despite a

19    robust defense, which I believe that the defense team will

20    provide, are going to be inherently prejudiced in terms of

21    rendering a fair and objective opinion on the facts in this

22    case.  We have 90 percent of the individuals in the

23    Greenville pool not having an affiliation with Columbia --

24    I'm sorry, with Dominion or SCANA as a result of the merger.

25    They are folks who get their electricity from Duke.  So we

1   think it makes perfect sense to use a Greenville jury pool.

2          However, there is a dispute, as I understand it, as

3   to how to get those jurors.  We don't think that it makes

4   sense to separate the jurors from the trial site.  One, they

5   are going to be compelled to either travel two hours each way

6   four hours a day, or they are going to be compelled to be

7   sequestered, which is a gross and very difficult

8   inconvenience for a jury, for jury members.

9          Secondly, we think that the pool of available jurors

10  are not going to represent a cross-section of -- a fair

11  cross-section of the community for Mr. Benjamin, because a

12  lot of those people will be eliminated simply by virtue of

13  the sequestering or the travel.  As we've outlined, we are

14  going to have individuals who have young children, K through

15  12.  We are going to have individuals who need to care for

16  sick or needy family members that can't be accommodated at

17  night, even if they sit at a jury during the day.  And we

18  also have people with medical infirmities that won't be able

19  to sustain a two-hour ride in the car, circulatory problems,

20  et cetera.  So we are going to be unfairly limiting the very

21  jury pool that we think is the best jury pool for Mr.

22  Benjamin in light of the ratepayer issue.  So it simply makes

23  no sense.

24          We believe that to provide due process for Mr.

25  Benjamin in a fair and impartial setting, we need jurors who

1    are not affiliated with the utilities at issue here.  And we

2    need jurors who can pay attention to the case, won't

3    otherwise be distracted, and most importantly, a pool that's

4    not limited by virtue of the individuals who won't be able to

5    be seated because of a medical or personal inconvenience.  So

6    we submit that we simply try the case in Greenville.

7            *Farkas* factors do not implicate that in any way,

8    shape, or form.  They are basically neutral.  There's nothing

9    in those factors that mandates that for any particularized

10   interest noted there, the case has to be tried in Columbia.

11   So that is our position, Your Honor.

12            THE COURT:  All right.  Thank you.

13            Mr. Andrews.

14            MR. ANDREWS:  Judge, we would agree with the defense

15   that the factors do not support a venue transfer when you are

16   looking at the convenience to the parties, when you are

17   looking at the conveniences to the witnesses.  It's going to

18   be the same whether it's here or in Greenville.

19            THE COURT:  I realize there's going to be some

20   inconvenience.  My biggest concern is the jurors.

21            MR. ANDREWS:  So I want to talk about that.  Because

22   in the defendant's motion, most of the press clippings that

23   they cite to are anger at SCANA and its executives.  We have

24   a different case here.  Jeff Benjamin was the vice president

25   of Westinghouse.  He worked in Pennsylvania.  He now lives in

1      Colorado.

2             THE COURT:  Are you now arguing that you don't want

3      the jury pool to come from the upstate?  You want it to be

4      here?

5             MR. ANDREWS:  Let me make it clear.

6             THE COURT:  I thought you had basically said you

7      didn't oppose drawing the jury from up --

8             MR. ANDREWS:  That's our fallback position, Judge.

9      Our first position is, we can do this trial here in Columbia

10     with a Columbia jury pool, and that the rules -- the factors

11     that support Rule 18 and Rule 21, the constitutional

12     limitations, none of those are supported here.  And the

13     primary reason is, this is not the same case, necessarily, as

14     the SCANA case.  Yes, it involves VC Summer.  But it's a

15     different party.  And there are different players involved in

16     the fraud that occurred here.  The $100 million a month that

17     Jeff Benjamin has been charged with defrauding from the

18     owners --

19             THE COURT:  Let's just assume that I don't agree

20     with you about the first part.  All right.  I believe I saw

21     in your papers that if we did select a jury from the upstate

22     pool, you still thought that we should bring the jurors here

23     and have the trial here in Columbia.

24             MR. ANDREWS:  That's correct.

25             THE COURT:  Why?

1        MR. ANDREWS:  Well, Judge, we don't think there's

2   any justification to move all of the resources of the Court

3   and, you know, our prosecuting entity up to Greenville for

4   weeks on end.

5        THE COURT:  It's a really nice courthouse.

6        MR. ANDREWS:  It's a beautiful courthouse.  There's

7   no --

8        THE COURT:  It's empty.  We would have the whole

9   courthouse to ourselves.

10       MR. ANDREWS:  I was there for the unveiling.  It's

11  amazing.  I have no grievances with the Greenville

12  courthouse.  But, Your Honor, our first position is this --

13  and, honestly, the fallback is us candidly trying to be

14  reasonable and find some way to find a middle ground on just

15  yet another issue that's been put before the Court.  Our

16  primary position is that this is a case that can be tried in

17  Columbia, that a number of years have passed, that there's no

18  public furor against Jeff Benjamin.  People here in Columbia

19  don't know who Jeff Benjamin is.

20       And to the extent that they know this story, they

21  think about SCANA, they think about SCE&G.  They are not

22  thinking about Westinghouse.  We can through voir dire and

23  through jury selection, absolutely weed out people who

24  have -- who cannot be fair and impartial or people who have

25  personal relationships to any of the entities that were on

1    site in Jenkinsville.  And that is the proper procedural

2    mechanism to pick a fair and impartial jury.  We can do that

3    here in Columbia.

4         Now, it has been our fallback position.  If the

5    Court is inclined in some way to not pick a Columbia jury

6    pool, then it is at least theoretically possible for us to

7    pick a Greenville jury pool and still try the case in

8    Columbia.  That is our position, Judge.

9         THE COURT:  Okay.  What about the inconvenience to

10   the jurors?  I mean, obviously, I would prefer for it to be

11   here.  Certainly, it would be easier for me and it would be

12   easier for you.  For everybody else, it wouldn't be easier.

13   So -- and I'm willing to travel to Greenville and stay in

14   Greenville for three weeks, or whatever I need to do, instead

15   of asking the jurors to do that.

16        MR. ANDREWS:  Well, Judge --

17        THE COURT:  I'm sure that -- I mean, y'all have your

18   offices all over the state.  To me -- and the witnesses are

19   kind of a neutral issue.  I mean, people are going to be

20   flying in and traveling from somewhere depending on where in

21   the trial their testimony might be needed.  I don't see that

22   being a huge factor.  I'm concerned about the jury.

23        MR. ANDREWS:  Judge, look, I am not going to

24   represent here that there would be no imposition on the jury.

25   There would be.  And, honestly, the issue with the

1    convenience to the parties and the witnesses, that's why I

2    come back to question one, which is, do we need to draw a

3    Greenville jury pool at all?  And I think we don't.  That is

4    our first position in this case.  I am not going to disagree

5    with you that it would be inconvenient for the jurors.  And

6    we know that it's a service -- already a difficult service to

7    be picked for a three-week jury pool.

8         THE COURT:  And you know this, of course, applies to

9    me too, even though they could stay in a hotel here, they

10   can't stay over the weekend.  So they all got to travel on

11   Friday, probably on Sunday to get back here in time to start

12   the trial.  It just -- I would just put them up in a hotel.

13   That doesn't sound so bad.  But it really is much more

14   disruptive than letting them sit in the Greenville and just

15   spend the days with us.

16        So, all right, Mr. Sullivan.

17        MR. SULLIVAN:  I think you've articulated everything

18   I might have said a few minutes ago.  We think the victimhood

19   of the jurors is a per se disqualifier.  The convenience of

20   the jury is paramount here.  We wouldn't have a

21   cross-sectional pool.  And, frankly, I didn't even mention,

22   there is much more adverse press in this area, much more

23   press saturated in this area than up in Greenville.  Thank

24   you, Your Honor.

25        THE COURT:  All right.  I think what I'm going to do

1   on this is, I'm going to grant the motion, even though I'm

2   pretty confident that we could, with enough time and effort,

3   draw a jury from this section of the state and give Mr.

4   Benjamin an impartial jury, I think the safer and surer way

5   to do that is to draw the jury from the upstate.  So that's

6   what I think we are going to do on that.

7           Now, the next is, you know, it's going to be an

8   inconvenience to the lawyers here in Columbia that are the

9   lead on the case.  It's going to be an inconvenience to me.

10  But having the case tried actually in Greenville, I think

11  will help us as far as the jury's participation concerns.  I

12  mean, if we do it here, I can see with COVID, excuses, people

13  are getting tired after a week or so of being out of town,

14  the next thing I know, I have COVID exposures and, you know,

15  who knows what could happen.  So even if we, you know, maybe

16  draw four alternates or even more, we could still run into

17  problems.  So I think I'm going to grant the motion.  We will

18  draw the jury from the upstate pool.  And we will have the

19  trial in Greenville.  Okay.

20          MR. SULLIVAN:  Thank you, Your Honor.

21          MR. ANDREWS:  Thank you, Judge.

22          THE COURT:  All right.  Anything further on any of

23  this?  All right.  Do we want to maybe schedule a pretrial

24  conference or something in advance of that?

25          THE COURT DEPUTY:  There's already one scheduled.

1          THE COURT:  When is that?

2          THE COURT DEPUTY:  In September.

3          MR. ANDREWS:  Judge, I have two other housekeeping

4    matters, if I could.

5          THE COURT:  Okay.

6          MR. ANDREWS:  We mentioned this in our most recent

7    motion, but a superseding indictment is imminent.  I will say

8    that it is some wordsmithing.  It is not substantive.  We

9    have not added counts.  We have not materially changed

10   counts.  But there are some differences here and there we

11   thought were appropriate.  And that should be available to

12   the defendant and to the Court we think very soon.  So I just

13   want to mention that.  It will, I believe, affect their

14   pending motion to dismiss.  Of course, they can look at the

15   superseding indictment and decide whether they want to

16   proceed with the motion, amend the motion.  I suppose that's

17   entirely within their discretion.  But I did want to raise

18   that for the Court, that that is happening.

19         THE COURT:  Okay.

20         MR. ANDREWS:  The other two issues, if I could

21   briefly in regards to scheduling, you will recall at the last

22   pretrial, we had really insisted upon the May trial date.  We

23   feel like this case is ready to try.  It has now been

24   continued to October.  We really want to be able to lock in a

25   date, a date certain for the trial.  We have a lot of

1    witnesses coming from a lot of places around the country.

2    The calendar indicates that we are drawing a jury on

3    Wednesday, October 4th.  We are flexible as to what that

4    first day of trial is, whether it's the date to follow or the

5    following Tuesday after the holiday.

6         I spoke with Bill Sullivan briefly about this a

7    moment ago.  It seems like we are on the same page in terms

8    of it being appropriate for the Court to set a date certain

9    so we can start getting in motion --

10        THE COURT:  I'm happy to do that because there's so

11   many witnesses that are going to be traveling.  It's just --

12   could be a mess.

13        THE COURTROOM DEPUTY:  Jury selection date may

14   change transferring it to Greenville.

15        THE COURT:  I think I asked Kathy to check with Fred

16   on that.

17        THE COURT DEPUTY:  Fred doesn't control that, if you

18   can still have jury selection on October 4th.

19        THE COURT:  Because he thought that wasn't going to

20   be a problem, but maybe we can just confirm that.

21        THE COURT DEPUTY:  I will take care of that when

22   this hearing is over.

23        THE COURT:  Of course, we have administrative issues

24   that, since we are moving the case to Greenville, my

25   intention was to keep the same jury selection date, just do

1    it in Greenville.  And we had some preliminary discussions

2    with the folks up there.  And I'm fairly confident that we

3    can do that.  But I'm informed that the coordinator up there

4    isn't in the loop yet.  And so we've got to verify that.  So

5    this might change.  But let's just proceed as if I'm going to

6    be able to have the jury selection on October 4th.  And

7    that's a Wednesday or a Thursday?

8              MR. ANDREWS:  That's a Wednesday, Your Honor.

9              THE COURT:  Wednesday in Greenville.

10             MR. ANDREWS:  Judge, we would not be opposed if the

11   Court -- whether it's on the 4th or not, if in the next

12   scheduling order, the Court wants to enter not just a date

13   for jury selection, but for actually beginning of the trial

14   proceedings, we would defer to the Court's judgment on that,

15   but we would welcome that, because it would give us some

16   certainty for planning.

17             THE COURT:  Let me ask you what your general

18   preference would be.  If we have a jury selection on, say, a

19   Wednesday or a Thursday, and it may be October 4th, would

20   you -- the parties' preference, would it be to begin the

21   trial immediately, the morning after, or that following

22   Monday or Tuesday, depending on whether it's a holiday?

23             MR. ANDREWS:  Your Honor, that is a federal holiday,

24   that following Monday.  And so it would be a long weekend.

25   We would be fine just to start the following Tuesday after

1    jury selection.

2        THE COURT DEPUTY:  That would be the 10th.

3        MR. SULLIVAN:  No objection here, Your Honor.

4        THE COURT DEPUTY:  October 10th.

5        THE COURT:  October 10th?

6        MR. ANDREWS:  That's correct.

7        THE COURT:  All right.  Then let's tentatively have

8    the jury selection on the 4th and we will start on the 10th.

9    If I have a problem with the folks in Greenville, I will get

10   that nailed down today.  And I will enter an order that sets

11   all that out.  Okay?

12       MR. ANDREWS:  Judge, just one other scheduling

13   issue, Judge.  We now have -- if I'm counting correctly,

14   we've resolved three pretrial motions.  There's another

15   pending.  There will inevitably be motions in limine

16   immediately before trial.  It would be helpful for the

17   Government for the Court to impose some kind of motions

18   deadline, perhaps in May, so that if we are going to see any

19   other motions with regard to dismissing the indictment or for

20   discovery or anything else, that we just get those out there

21   so that we can be resolving those and not stepping on the

22   toes of motions in limine, motions for evidence, and other

23   things like that before trial.

24       MR. SULLIVAN:  Yes, Your Honor.  I've had

25   preliminary discussions with Mr. Holliday about doing

1   precisely that.  We are amenable to that.  Only caveat would

2   be to the extent that evidentiary issues pop up as we

3   continue to investigate the case, we are going to have to

4   make those motions as we learn about the reasons therefore.

5   So motions in limine, we won't be able to specifically

6   schedule.  But we can set a generalized motion schedule we

7   can adhere to --

8           THE COURT:  Why don't you all put something together

9   that you agree to and then submit it to me and I will enter

10  it.

11          MR. ANDREWS:  We can do that, Judge.

12          MR. SULLIVAN:  My only other thought was, in light

13  of the Greenville move, we would have difficulties if

14  Greenville cannot accommodate us on October 4 or later.  If

15  Greenville is going to try to suggest an earlier date, in

16  light of some of the things we need to do, that would be more

17  difficult.  So I would anticipate that we will hold October

18  4, or if necessary, maybe a bit beyond it.  But if Greenville

19  only has dates in September or August, we can't accommodate

20  that, unfortunately, Your Honor.

21          THE COURT:  Well, we won't do it.  It's going to be

22  October.

23          MR. SULLIVAN:  All right.  Great.  Thank you so

24  much.

25          THE COURT:  All right.  Anything further?

1          MR. ANDREWS:  Nothing further.

2          MR. SULLIVAN:  Thank you for your time, Your Honor.

3          (Whereupon, proceedings are adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF REPORTER</u>

2

3          I, Karen V. Andersen, Registered Merit Reporter,

4    Certified Realtime Reporter for the State of South Carolina

5    at Large, do hereby certify that the foregoing transcript is

6    a true, accurate and complete Transcript of Record of the

7    proceedings.

8          I further certify that I am neither related to nor

9    counsel for any party to the cause pending or interested in

10   the events thereof.

11

12

13

14

15                          Karen V. Andersen
                            Registered Merit Reporter
16                          Certified Realtime Reporter

17

18

19

20

21

22

23

24

25